# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## LAURA W. ELDER v. J. B. ELDER.

### June 12, 1924.

1. DIVORCE—*Cruelty—Violence and Apprehension of Bodily Hurt—Mental Anguish.*—Violence and apprehension of bodily hurt, though nearly always appearing in suits for divorce on the ground of cruelty, are not indispensable ingredients of that offense. Mental anguish, repeated and unrelenting neglect and humiliation, may be as bad as physical wounds and bruises, and may be visited upon an unoffending spouse in such degree as to amount to cruelty even in the very strict sense in which that term ought always to be used in the law of divorce.

2. DIVORCE—*Cruelty Tantamount to Desertion.*—Cruelty on the part of the husband which results in the wife's enforced separation from his bed and board is tantamount to desertion on his part.

3. DIVORCE—*Condonation—Definition.*—Condonation is defined to be the remission, by one of the married parties, of an offense which he knows the other has committed against the marriage, on the condition of being continually afterward treated by the other with conjugal kindness.

4. DIVORCE—*Cruelty—Charge of Adultery.*—Nothing can be more grievous to a true and faithful wife than a malicious charge from her husband of adultery. Standing absolutely alone it is commonly regarded as not quite sufficient to justify a divorce, yet, when presented with other facts enhancing its enormity, it is deemed a gross act of cruelty.

5. DIVORCE—*Condonation—Change of Mind—Case at Bar.*—In the instant case complainant who had left defendant on account of his cruelty, offered in a letter to return upon a promise of good treatment. Defendant met this advance in a conciliatory manner, writing complainant and asking for an interview, but complainant wrote him that since thinking it over she had changed her mind, as she was afraid his treatment would be worse than ever.

   *Held:* That this did not amount to condonation on the part of the wife.

6. DIVORCE—*Condonation—Essential Elements.*—The essential elements of condonation are freedom of consent, knowledge of the offense and restoration of the marital rights.

7. DIVORCE—*Appeal and Error—Presumption in Favor of Decree.*—While there is a presumption in favor of the correctness of a decree of the lower court in divorce proceedings, this presumption is always rebutted where the greater weight of the evidence is against it.

8. DIVORCE—*Cruelty—Desertion—Case at Bar.*—In the instant case it clearly appeared by a preponderance of the evidence that the defendant had subjected the complainant, a true and faithful wife, to actual violence and threats of death, or serious bodily injury, with a pistol and knife; that he also addressed her in coarse and abusive language, and forced her to submit to the basest and most cruel insults, including the malicious charge of adultery, followed by a command to leave his house. The wife's conduct had been beyond reproach.

*Held:* That a charge of cruelty and desertion was fully established.

Appeal from a decree of the Circuit Court of Din-widdie county. Decree for defendant. Complainant assigns error.

*Reversed and remanded.*

The opinion states the case.

*Mann & Townsend,* for the appellant.

*R. H. Mann,* for the appellee.

WEST, J., delivered the opinion of the court.

Laura W. Elder sued J. B. Elder for a divorce. This is an appeal from a final decree denying relief and dismissing her bill.

The allegations of the bill are: "That complainant has been a dutiful and faithful wife; that her husband, on the contrary, has frequently failed to treat her with the respect and consideration due a wife, and has been quarrelsome and disagreeable in his conduct towards her, and has on occasions been cruel to her, calling her vile names and threatening her with bodily injury, and telling her that she would have to leave home, which

treatment has been steadily growing worse, especially for the past nine or ten months, rendering her life miserable and wretched, until on Saturday night, September 10, 1921, and the following morning, his treatment of your complainant was so cruel, violent and abusive, calling her vile names, accusing her of unseeming conduct, threatening to shoot her and to cut her throat, and ordering her to leave the place, that your complainant, feeling that she could no longer put up with such treatment and fearing bodily harm, took her two infant children and went to stay with one of her grown sons, who resides in the county, where she and her children have since been staying.

"That by reason of the foregoing treatment, which compelled your complainant to leave home, she alleges that on said 11th day of September, 1921, the said defendant, regardless of his marriage covenants and duties, was guilty of cruelty towards her and willfully deserted and abandoned her without any just or legal or reasonable cause therefor, and has continued in such abandonment and desertion up to the present time."

The prayer of the bill is for a divorce *a mensa et thoro* from the defendant, and, at the end of three years, a divorce *a vinculo matrimonii;* for alimony, counsel fees, and suit money; and for the control and custody of their two infant children, Harrison Elder, age eleven, and Laura Emma Elder, age seven years. The answer of the defendant denies all the allegations of the bill tending to show cruelty or desertion on his part, and calls for strict proof.

At the time of the marriage, complainant, then Laura Meredith, was a widow with six children and the defendant was a widower with four children.

It appears from the evidence introduced on behalf of the complainant that there were many occasions,

prior to September 10, 1921, when the defendant was abusive, cruel and unkind to her.

The first incident occurred during the Petersburg fair. Defendant came home and got mad with complainant, cursed her, called her a vile name, slapped her jaws, pulled her hair, rubbed her head against the wall, drove her out of the house in her night clothes and required her to stay out until he told her to come in.

About two months before her last baby was born defendant cursed complainant and slapped her out of the chair, under the table, because she corrected one of his children.

Not long thereafter defendant got mad, because Pete Meredith was given permission by complainant, his mother, to spend the night at Mr. Lewis', and cursed her and called her a "damned old b———."

. It appears from the testimony of the complainant and of J. S. Meredith and Lewis Roy Meredith, that on one occasion when she wanted a horse to drive to the store, defendant got mad and told her to go into the house and "shut her d—— mouth."

It is proven by the testimony of Mrs. Elder and Pete Meredith that at Christmas, 1920, the defendant flew into a fit of temper and pushed his fist up in her face, knocked her eye-glasses up and cut her eye. Meredith says, he "pulled her glasses up on her head and cut her forehead and said he was going to kill her."

Mrs. Elder gives the following account of what happened on the Saturday night preceding, and on the Sunday morning on which she was forced to leave her home: "I did not know there was anything the matter with him. * * He met me in the next door and run his fist all up on my face." "You have done it now," he said. I said: "* * you start quarreling, I will holler out and let everybody know." He said: "If you.

open your mouth I will cut your throat from ear to ear," and took his knife out of his pocket. Later, when we went to retire he wouldn't let me get in the bed. He said: "You d——— old thing, you shan't sleep with me." He got his pistol and, calling me a vile name, said: "I am great mind to shoot you." * *

"The next morning.he took up his pistol and came to the cook room after me, quarreling with me. He then accused me of improper relations with his brother, Mell, and said: 'You have got to leave here today. I am tired of feeding you anyway. I am great mind to put a ball between your eyes, but the ball is too good to be wasted on you.'"

The testimony of the complainant on all material points is fully corroborated by the testimony of other witnesses.

Mrs. Elder further testified that she was forced to leave home, driven away, and was afraid of him; and that many times for eight months he had falsely accused her of adultery with his nephew and his brother. Her son, Peter W. Meredith, also testified that he had heard the defendant accuse his mother four or five times of being too intimate with George Elder and J. M. Elder.

The defendant, testifying in his own behalf, denied most of the specific acts of cruelty, violence and abuse shown in evidence against him. He admitted, however, that he slapped his wife at the table and gave as his excuse that she was "abusing and whipping a motherless child." Three eye witnesses testify that Mrs. Elder did not touch the child.

Defendant makes no denial as to what occurred at Christmas, 1920. When interrogated as to his conduct on Saturday night, September 10, 1921, he makes no denial but undertakes to excuse himself by saying:

"I got hold of a little corn.   I don't know anything that happened at that time."   He introduced as witnesses his brother and nephew, who testified he was drunk.   Two witnesses, however, testify to facts which show that the defendant was not drunk on that occasion.   They say he danced and played on the organ as well as usual, and that when he went to bed he pulled off his clothes and knelt down and said his prayers.

Defendant's statement that he did not see his wife on Sunday morning before she left is denied by Mrs. Elder, Peter W. Meredith and Harrison Elder, his oldest child by the second marriage.

Defendant introduced as witnesses several of his neighbors and friends who testified that when visiting in the Elder home, as they frequently did, they never heard or saw anything to make them think Mr. Elder was guilty of any improper treatment of his wife.   Mrs. Elder explains this by saying her husband cautioned her not to tell anything that happened between them, that if she did, it would not be good for her.

On November 23, 1921, Mrs. Elder wrote her husband the following letter:

"Dear Balaam:

"I don't know whether you want to hear from me or not, but I will write to let you hear from me.   Balaam, if you will make it up in your mind that you will treat me better than you have and you want me to come back to you, I will come, if you will go to see lawyer Mann and if he can stop the suit now, I will come to you and we will live together happy, as husband and wife ought to live.   I will forgive you for the way you have treated me and we both must look for the future to be bright and happy, for you know we have two little children to see after.   Now, if it isn't too late to stop the suit and you want me to come back,

I will come. I don't know how you feel towards this. Let me hear from you. Laura."

On November 25, 1921, the defendant replied:

"I got your letter and am glad to know you want to come home. I want to see you and the children so much, I would like to *see you and talk it over.* (Italics ours.) I would be glad if you will meet me in Petersburg. I am sending you $5.00 to pay your way. Please write me what train you will go on, and I will be there, or if you think best, I will meet you at Bob's tonight. Please write me by Bob what to do.

"Your loving husband, J. B. Elder."

Upon receipt of defendant's letter Mrs. Elder returned it to him with the $5.00. To this letter Mrs. Elder made the following reply:

"Balaam:

"The letter you got from me just destroy it. Since writing it, I have changed my mind. I am afraid your treatment of me would be worse than ever. Since thinking it over, I won't come back. Laura."

[1, 2] The law applicable to the instant case is laid down in two cases, *Ringgold* v. *Ringgold*, 128 Va. 485, 104 S. E. 836, 12 A. L. R. 1383, and *Owens* v. *Owens*, 96 Va. 191, 31 S. E. 72.

In the *Ringgold Case*, Kelly, P., speaking for the court, says: "In *Latham* v. *Latham*, 30 Gratt. (71 Va.) 307, a landmark in the divorce laws of Virginia, the court held that the evidence was not sufficient to show either cruelty or desertion; but that learned jurist, Judge Staples, who delivered the opinion, was careful to say: 'I agree there may be cases in which the husband, without violence, actual or threatened, may render the marriage state impossible to be endured. There may be angry words, coarse and abusive lan-

guage, humiliating insults, annoyances in all forms that malice can suggest, which may as effectually endanger life, or health, as personal violence, and which, therefore, would afford grounds for relief by the court.' "

The holding of the court in that case is succinctly stated in the syllabus in the following language:

"Violence and apprehension of bodily hurt, though nearly always appearing in suits of divorce on the ground of cruelty, are not indispensable ingredients of that offense. Mental anguish, repeated and unrelenting neglect and humiliation, may be as bad as physical wounds and bruises, and may be visited upon an unoffending spouse in such degree as to amount to cruelty even in the very strict sense in which that term ought always to be used in the law of divorce.

"Cruelty on the part of the husband which results in the wife's enforced separation from his bed and board is tantamount to desertion on his part."

[3, 4] Keith, P., delivering the opinion of the court in the *Owens Case,* said this:

"Condonation is defined to be the remission, by one of the married parties, of an offense which he knows the other has committed against the marriage, on the condition of being continually afterward treated by the other with conjugal kindness. 2 Bishop, M. & D., sec. 29. As the result of this rule, while the condition remains unbroken there can be no divorce, but a breach of it revives the original remedy. Cruelty, it is said, is cumulative, admitting of degrees and augmenting by addition; so that it may be condoned and even forgiven for a time, and up to a certain point without any bar in sense or reason to bring it all forward when the continuance of it has rendered it no longer condonable. While, therefore, acts of violence committed at an earlier period, and which have not prevented the wife

from living with her husband, or going back to him after they have been separated, cannot be made the sole foundation of an action for separation; they form the subject of investigation and proof with a view to determine what is the true issue in the case, namely: whether the wife can with safety to her person and health continue to live with him.    2 Bish. M. & D., sec. 304.    *   *   *

"Nothing can be more grievous to a true and faithful wife than a malicious charge from her husband of adultery.    Standing absolutely alone it is commonly regarded as not quite sufficient to justify a divorce, yet when presented with other facts enhancing its enormity, it is deemed a gross act of cruelty.    1 Bish. M. & D., sec. 1569."

[5, 6] Mrs. Elder has not condoned the many offenses which her husband committed against the marriage. The essential elements of condonation are freedom of consent, knowledge of the offense and restoration of the marital rights.    There was no restoration of the marital rights.    Believing as she says she did, that he would, if she returned, treat her "like he had, or worse," she had the right to change her mind, and not come back to him.

The answer does not pray that the care and custody of the two children be awarded to the defendant, and the evidence shows that the complainant is a suitable person to care for and rear them.    Harrison Elder, the older of the children, testified that he preferred to live with his mother.

[7] We are not unmindful of the presumption in favor of the correctness of a decree of the lower court, but this presumption is always rebutted, where, as in the instant case, the greater weight of the evidence is against it.

[8] It clearly appears by a preponderance of the evidence that the defendant has subjected the complainant, a true and faithful wife, to actual violence and threats of death, or serious bodily injury with a pistol and a knife, and that he has also addressed to her coarse and abusive language and forced her to submit to the basest and most cruel insults, including the malicious charge of adultery, followed by the command, "You have got to leave here today."

The conduct of the wife has been above criticism, and furnishes no justification or excuse for the actions of the husband. The charge of cruelty and desertion is fully established.

The decree under review is erroneous and will be reversed.

Proceeding to dispose of the case as seems right and proper, a decree will be entered here reversing the decree complained of, granting the complainant a divorce *a mensa et thoro*, awarding the care and custody of the two children, Harrison Elder and Laura Emma Elder, to the complainant, their mother, with leave to the defendant, their father, to visit them once in two weeks, if he desires so to do.

The case will then be remanded to the circuit court, with instructions to ascertain and allow reasonable sums of money to the complainant as permanent alimony and for the support of the two infant children, and require the defendant to pay such sums in monthly or quarterly instalments.

The circuit court will also be directed to retain the case upon the docket so that the decree as to the custody of the children may be changed whenever the conditions surrounding them have changed and their best interests so demand; and for such other relief as may be hereafter properly granted herein.

*Reversed.*