Nellie V. Currence *v.* Henry P. Currence

(No. 9188)

Submitted September 24, 1941. Decided October 28, 1941.

C. O. *Strieby*, for appellant.
E. L. *Maxwell*, for appellee.

Rose, Judge:

Nellie V. Currence was awarded this appeal from a final decree of the Circuit Court of Randolph County denying her a divorce from Henry P. Currence.

The grounds for divorce alleged in the plaintiff's bill are: (1) habitual drunkenness on the part of the husband; (2) cruel and inhuman treatment; and (3) reason-

able apprehension of bodily hurt. Defendant answered, denying in detail these charges, and pleaded condonation.

The evidence was taken under a decree of reference to a commissioner in chancery, and on final hearing, the court by its order found that the case was "for the defendant", and dismissed the bill.

The record discloses that the plaintiff and defendant were married August 29, 1936, he being at that time sixty-three years of age and her age being thirty-nine. The plaintiff was a college graduate and, prior to her marriage, had been a school teacher in Randolph County. She had not been previously married. The defendant was a farmer whose first wife was deceased. A son was born of this first marriage who is married and lives elsewhere. Defendant was supposed to own a farm of 104 acres on which there was a good eight-room house with the customary farm buildings. This farm is estimated variously to have been of the value of from six to thirteen thousand dollars.

For a time, the couple appear to have lived together harmoniously, each performing the arduous work customary to a husband and wife on a West Virginia farm. Some trifling differences as to details of the farm affairs seem to have occurred, particularly as to the division of the proceeds from the sale of farm products, but nothing serious is reported until the summer of 1939.

The wife performed the laborious duties of a housewife on a farm, including milking, churning, raising garden vegetables, canning fruits, etc., with only occasional short-time assistance of hired help. In June, 1939, a girl named Mary Young applied for work as a hired girl, being brought to the house by one Graham. She was engaged for an indefinite term at seventy-five cents a week, including, of course, board and room. The plaintiff says the employment was by the mutual act of herself and her husband, but the husband testifies that he objected from the beginning, being suspicious of the relations between Mary and the man Graham, who appeared to be her lover and who continued to pay her marked attention. He further says that upon inquiry, he

was told that Graham was a married man, and that the girl had previously been delivered of two illegitimate children. These rumors appear to have been unfounded. The defendant further says that his suspicions were emphasized by the fact that Graham occasionally took the girl away over night, and that he stayed at the Currence home one night under circumstances which led the defendant to strongly suspect that the two had occupied the same bedroom. At any rate, the defendant continued to demand that the girl be dismissed by the plaintiff, while she insists that she did not oppose the dismissal, but merely took the position that the husband do the discharging.

The crisis came August 16th when the husband and wife, and the maid went to Elkins to take the wife's sister to the train. The husband saw his wife and the girl go into a doctor's office, and, being suspicious, followed them. Upon inquiry from the doctor, he was told that the girl had come for examination as to her possible pregnancy. At home that night, the plaintiff says that just before retiring she was bathing her feet in the kitchen when her husband came into the room in great anger and demanded that the girl be immediately discharged, called the girl a whore and applied the same epithet to the plaintiff. She then says that in her resentment she called the defendant a son-of-a-bitch, whereupon he reached for her throat and she seized an empty teakettle with which to protect herself, upon which the defendant struck her two or three times with his fist finally knocking her down, and kicking her two or three times as she lay on the floor against the wall; that at this time, the maid appeared from her room over the kitchen, and that, upon her intervention, the defendant retired from the room. The plaintiff says that the blows were of such a character as to leave wounds on her face and about her body; that she was badly injured and stunned, and that she and the maid went to the car for the purpose of getting a doctor's assistance when the defendant appeared and refused them the use of the automobile; that then she and the girl went to her mother's home for the night.

Mary Young corroborates the plaintiff on some vital points. She testifies that she heard the altercation in the room beneath her, and distinctly heard the defendant apply the word "whore" to both herself and his wife; that when the struggle began she rushed downstairs, and found the defendant standing over his fallen wife, apparently very angry, and in a menacing attitude; and that the defendant left at the request of the witness.

The defendant's story is, as may be expected, substantially different. He states that immediately before the altercation he was in an adjoining room from the kitchen performing his ablution and was barefooted; that he stepped into the kitchen and spoke to his wife about Mary, insisting that she be dismissed, and stated that he did not intend to have his home made a whorehouse; that his wife immediately became frantic, seized a teakettle, announcing that she would scald his eyes out; that he then seized her arm causing her to drop the teakettle, whereupon she reached for a butcher knife lying nearby and that he, in self-defense, struck her once and knocked her down. He denies that he struck or kicked her after she fell, calling attention to his bare feet, but admits that he left when the girl intervened, and that he afterwards denied his wife the use of the car.

On these facts, the plaintiff made a clear showing of cruel and inhuman treatment, and justified her claim to be reasonably apprehensive of bodily hurt. Her version of the episode is clearly corroborated by Mary Young on its vital points. Our statute provides that a "charge of prostitution made by the husband against the wife falsely shall be deemed cruel treatment." Code, 48-2-4(d). And the clear preponderance of the evidence tends to show a brutal and unjustified assault by the husband on the wife. On the other hand, his explanation of his conduct makes a very poor showing of self-defense or other justification, while the bruises on the woman's face and body, testified to by a physician who attended her, and by a neighbor, as well as by the plaintiff and the maid, are wholly inconsistent with his contention that he struck her but a single blow.

But on the following day, the wife returned with her brother to the Currence home for the purpose, as she explains, of getting her clothes and other belongings, at which time some kind of reconciliation seems to have been reached between the husband and wife, which resulted in her remaining with her husband from the 17th day of September to the 2nd day of November, during which time full and complete marital relations were sustained between the pair. This clearly operated as a condonation of the defendant's offense, and prevented the maintenance of a suit for divorce by the plaintiff against the defendant while such condonation continued in effect. Code, 48-2-14; *DeBerry* v. *DeBerry*, 115 W. Va. 604, 177 S. E. 440; *Anderson* v. *Anderson*, 78 W. Va. 118, 88 S. E. 653; 17 Am. Jur., Divorce, sec. 208; 27 C. J. S., Divorce, sec. 60.

Condonation of a marital offense, however, is always conditional, not absolute. Equity treats such forgivenness as being subject to the implied provision that the offending spouse will thereafter refrain from a violation of his marital duties. Upon such subsequent violation of marriage obligations, the condonation is neutralized or terminated, and the injured spouse then may have recourse to the original offense as the basis for divorce. The subsequent conduct of the offender which will deprive him of the right to rely upon the condonation need not amount to a separate ground for divorce. It need only be of such a character as to indicate the bad faith of his repentence and his implied promise to observe his marital obligations. No definition of such subsequent conduct is possible, but common sense and authority seem to require that it shall sink to the grade approaching marital offense and partaking in at least a substantial degree of such an offense. *Rice* v. *Rice*, 88 W. Va. 54, 106 S. E. 237; *Deusenberry* v. *Deusenberry*, 82 W. Va. 135, 95 S. E. 665; *Elder* v. *Elder*, 139 Va. 19, 123 S. E. 369.

The plaintiff and defendant after their reconciliation seem not to have been entirely happy or congenial. The record shows many trifling irritations between them. Only two incidents are suggested which are claimed to operate to revive the original ground for divorce. Plain-

tiff testifies that the defendant watched over her correspondence; and that on one occasion he charged her with "writing suspicious letters." She replied that the letter in question was in her purse, at which he searched the purse and announced that he could not find the letter. The plaintiff then explains that the letter was in a zipper compartment of the purse which he did not understand, and that she didn't take the time nor the trouble to explain the matter to him. Afterwards, she says, she placed in her bosom some paper as a protection against cold, which was later detected by her husband who then charged her with concealing the letter in her bosom, at which she "could hardly keep from giggling"; and that he then demanded "If you don't show me those letters I am going to tear every stitch of clothes off you," having on his face the same vicious look as at the time of the former altercation; but that upon her saying: "You'd better leave me alone," he did leave her alone.

This incident, when fully appraised, seems not to have been very serious. In fact, the wife appears to have directly contributed to her husband's vexation, and even to have considered it a laughing matter that finally terminated by his obeying her simple request "to leave me alone." Moreover, the defendant wholly denies that such an incident ever occurred. This episode, therefore, cannot be availed of to revive the original cause of action.

On the day before the final separation on November 2nd, some disagreement occurred over the plaintiffs' depositing in a bank in Elkins seven dollars to which the defendant thought he had some claim. When the plaintiff arrived home she discovered that the defendant had sold all the cows but one and a horse, his explanation being that he had given a postdated check to his son which was then due, and that it was necessary for him to raise the money at once, the banks having refused him a loan, but which explanation is quite clearly discredited by other evidence in the case. Even if the sale of the stock was for the purpose of vexing and annoying the plaintiff, we think the act is not of such character as would affect the condonation of the event of September

16th. It does not appear that it would in any way change the plaintiff's livelihood other than to reduce her pin money from dairy products, while at the same time relieving her of the laborious tasks connected therewith. Conduct by the offending spouse, which will neutralize the condonation of acts which may be the basis of a divorce suit must partake in some degree of the character of a recognized ground for divorce, and raise a reasonable apprehension that the original offense will be repeated or that some other act constituting a ground of divorce will be committed. 17 Am. Jur., Divorce, Sec. 213; 27 C. J. S., Divorce, sec. 62, c (2). The charge of habitual drunkenness is not sustained by the evidence, and seems to be abandoned on this appeal.

On the whole, therefore, we cannot say that the court was wrong in dismissing the plaintiff's bill.

One other matter, however, appears on the record, which requires comment. The cause was referred to a commissioner who was "directed to take and return the testimony in this cause, upon the issues made up by the pleadings filed and to be filed in the future in this cause, together with a report of all of the facts said Commissioner may be able to obtain as to property and property rights of the parties hereto, their income, character, and their respective places of residence from the time of marriage to the time of making up this report, * * *." This decree is in substantial compliance with the statute. Code, 48-2-26, which provides that:

> "Instead of proceeding with the cause under the provisions of the twenty-third section of this article, the court may, in its discretion, refer it to one of the commissioners in chancery of such court, or to a special commissioner, who shall take and return the testimony in such cause, together with a report of all such facts as the commissioner may be able to obtain as to property rights of the parties, their income, their character, conduct, health, habits, their children, and their respective places of residence from the time of their marriage up to the time of such report, and any other matter deemed necessary by the court.

and all such facts so reported shall be considered by the court in passing on the merits of the cause, whether the same be referred to in the pleadings or evidence, or not."

The commissioner thereupon took and returned 395 typewritten pages of evidence, but did not report any of the specific facts required by the decree. He begins the report with this statement: "In view of the voluminous depositions (much of which is not material or relevant), and the seriousness of the charges and denials of the parties in respect to the material issues in this cause, the Commissioner deems it advisable to give Your Honor a full summary of the pleadings and in many instances to quote portions of the language of the allegations thereof." He then continued for forty pages of the printed record to summarize the pleadings, the evidence and the law, concluding as follows: "Therefore, under all the circumstances and facts viewed with the law governing such cases as this, the plaintiff should be denied a divorce from the bonds of matrimony existing between her and the defendant, alimony, and a settlement and division of the defendant's property." Appended to this report is a verified certificate in which is contained the following: "I was actually and necessarily engaged in preparing notices and subpoenas, taking and reading depositions, examining statutes and decisions of the West Virginia Supreme Court of Appeals, and preparing this report, at least two hundred twenty-five (225) hours." A charge is made of $225.00 as the commissioner's fee. The report shows that the commissioner actually took evidence on seven different days, from which it necessarily follows that by far the greater part of these 225 hours was devoted to the making up of this report.

It will at once be observed that the commissioner, aside from taking and returning the evidence, did nothing whatever which he was directed to do, but took upon himself the actual decision of the case on its merits. The statute does not in any way attempt to authorize a court to refer a cause to a commissioner for the purpose of de-

termining the main issues in the case. Such a delegation of his duty to determine the case, no court could make. *Kimberly* v. *Arms,* 129 U. S. 512, 9 S. Ct. 355, 32 L. Ed. 764; *Gist* v. *Virginian Railway Co.,* 79 W. Va. 167, 90 S. E. 554; *Carle* v. *Corhan,* 127 Va. 223, 103 S. E. 699. The decree did not purport to require from the commissioner such labor or such report. Nevertheless, the commissioner seems to have devoted about three weeks time to digesting the pleadings and evidence and the studying of the law to enable him to advise the court as to the decision on the merits. This the commissioner had no right to do, and his report to this extent was a nullity. *White* v. *Drew,* 9 W. Va. 695; *Ware* v. *Starkey,* 80 Va. 191. And the parties to the suit should not be required to pay him for doing this extra-legal work.

On the final hearing, the court decreed that "the report of the Commissioner in Chancery, * * *, be, and the same is hereby, confirmed." This was not justified. The report in no way conformed to the decree of reference, and, other than returning the evidence, did nothing that could be either confirmed or reversed. The report should have been suppressed except in so far as it returned the evidence.

It might be considered that such a report was harmless, on the presumption that the court will be deemed to have considered only matters properly before it, and counsel in argument suggest that the report was merely advisory. It cannot be considered advisory or of any other character than as a nullity. Nevertheless, the final decree contains this sentence: "And the court having fully considered the pleadings, report of Commissioner in Chancery, * * *, and the evidence taken before him and filed with said report, is of opinion that this case is for the Defendant." If this sentence means anything it clearly shows that the court, in making his final decision, considered the commissioner's report on equal terms with the pleadings and the evidence. This he could not do. Such use of the report might justify a reversal, were it not for the fact that upon consideration of the whole case, we

cannot see how the court could have arrived at a different decree if the report had been disregarded. Also, the court's use of the report is not assigned as error.

The decree of the circuit court, appealed from, is accordingly affirmed.

*Affirmed.*