348 S.E.2d 293

**Larry V. STARCHER**

v..

**Paul CRABTREE, as Administrator, Supreme Court of Appeals of the State of West Virginia, and Dr. Sharon Lord, as Commissioner, West Virginia Department of Human Services.**

No. 17169.

Supreme Court of Appeals of West Virginia.

June 25, 1986.

Dissenting Opinion of Justice McGraw, July 8, 1986.

Dissenting Opinion of Chief Justice Miller, Aug. 25, 1986.

Thomas W. Rodd, Morgantown, for appellant.

Charles Brown, Atty. Gen., Kenneth E. Knopf, Frances A. McElwee, Robert E. Wilkinson, Asst. Attys. Gen., Charleston, for appellee.

Penelope Crandall, Charleston, Christine Hedges, Spencer, for amicus curiae, W.V. Chapter of Nat. Organization for Women.

A. Andrew MacQueen, III, pro se.

BROTHERTON, Justice.

The petitioner, Larry Starcher, a circuit court judge, comes to this Court seeking an original writ of prohibition and mandamus, commanding the respondents, Paul Crabtree, Administrative Director of the Supreme Court, and Dr. Sharon Lord, Commissioner of the Department of Human Services, not to implement the family law master provisions of the recently enacted Enrolled H.B. 2094, 68th Leg., Reg.Sess., 1986 W.Va. Acts, which is scheduled to take effect July 1, 1986. We agree with the petitioner and grant the writ.

The federal "Child Support Enforcement Amendments of 1984," 42 U.S.C. §§ 651–667, required states to legislate certain proven child support techniques before July 1, 1986, or face a reduction of federal monetary support for the states' Aid to Families of Dependent Children program. In order to comply with this law, the West

**708**

Virginia legislature passed H.B. 2094, which divested the circuit courts of all original jurisdiction in divorce and other domestic matters and placed this jurisdiction in the hands of a newly created family law master.[1] The circuit court retained only a limited appellate jurisdiction.[2]

■ The petitioner claims that this divestment of original jurisdiction violates the West Virginia Constitution. We agree, and grant the writ prayed for.

Before West Virginia was a state, the power to grant divorces resided in the Virginia legislature by special enactment. The legislature, however, lost its power to grant divorces when the West Virginia Constitution was ratified. Article 6, Section 39 prohibits the legislature from granting divorces, but states that "the legislature shall provide, by general laws, for (divorces)." Thus, while the legislature lost the power to grant divorces, it still retained many powers, including the power to choose the forum for divorce. Under the 1872 West Virginia constitution, the legislature could either allow the circuit courts to handle divorces under Article 8, § 12 or form a limited court for that purpose under Article 8, § 19. The legislature allowed both to have concurrent jurisdiction. *See* W.Va. Code § 48-2-5 (1980). The courts, recognizing the legislature's ability to change forums, acknowledged that neither law courts nor equity courts had the inherent power to dissolve marriages and the authority of a court to decree a divorce was purely statutory. *See, e.g.,* syl. pt. 1, *State ex rel. Cecil v. Knapp,* 143 W.Va. 896, 105 S.E.2d 569 (1958).

Courts of limited jurisdiction, however, were abolished by the Judicial Reorganization Amendment of 1974 to the West Virginia Constitution. *See* W.Va. Const. Art. 8, § 5. The amendment eliminated the legislature's power to change the jurisdiction of divorce cases and constitutionally placed divorce cases in the circuit court. *See Pat-*

1. H.B. 2094 at § 48A–4–1 provides in part:
"(i) Circuit court or the chief judge thereof shall refer to the master the following matters for hearing to be conducted in accordance with the provisions of section two of this article:
    (1) Actions to obtain orders of support brought under the provisions of section one, article five of this chapter;
    (2) All actions to establish paternity under the provisions of article six of this chapter except such actions wherein either or both of the parties have demanded a trial by jury of the law and the facts by the circuit court;
    (3) All motions for child or spousal support pendente lite;
    (4) All actions and motions wherein child custody or child visitation is in issue;
    (5) All petitions for modification of an order involving child custody, child visitation or child support or spousal support; and
    (6) All uncontested divorce actions wherein the defending party has failed to answer or appear, or having made an appearance has filed an answer admitting irreconcilable differences or grounds for divorce, has withdrawn his or her answer or other responsive pleading, or has filed a notice of waiver of further proceedings, and wherein all issues except the question of whether or not a divorce should be granted have been resolved;
    (7) On and after the first day of September, one thousand nine hundred eighty-six, all contested divorce actions.
    (j) A master shall hear, in addition to the matters described in subsection (i) of this section, such other domestic relation matters as may be referred to the master by the court. Provided, That a master shall not hear a case wherein an obligor is charged with criminal contempt, when such obligor has not waived his right to trial by jury."

2. H.B. 2094 at § 48A–4–9 provides in part:
"(a) The circuit court shall proceed to a review of the master's final order when a petition has been filed within ten days of the entry of a master's final order;
    (b) To the extent necessary for decision and when presented, the circuit court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the appropriateness of the terms of the master's final order.
    (c) If a petition for review has been timely filed, the circuit court shall examine the master's final order, and may enter an order affirming the master's final order or may remand the case upon a finding that the master's final order is:
    (1) Arbitrary, capricious, an abuse of discretion, or otherwise not in conformance with the law;
    (2) Contrary to constitutional right, power, privilege, or immunity;
    (3) In excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
    (4) Without observance of procedure required by law; [or]
    (5) Unsupported by substantial evidence[.]"

terson v. Patterson, 167 W.Va. 1, 277 S.E.2d 709, 715 (1981).

Because the constitution places the jurisdiction for divorces and other domestic matters [3] in the circuit court, the legislature's efforts to divest this jurisdiction by statute is unconstitutional and therefore void.

Recognizing that this ruling could cost the State some of the federal aid to the A.F.D.C. program, we are sorely tempted to redraft or selectively edit H.B. 2094 to make it constitutional. It is not the function of this Court, however, to redraft acts of the legislature. That is a legislative function, which this Court is forbidden from exercising. See W.Va. Const.Art. 5, § 1. We also lack the power selectively to edit so as to bring about a material change. See, e.g., syl. pt. 20, State ex rel. Trent v. Sims, 138 W.Va. 244, 77 S.E.2d 122 (1953). We are left with little choice but to strike out, in its entirety, Article 4 of H.B. 2094, which sets up the family master system. Other portions of H.B. 2094 are unrelated to the family master system and are unaffected by this ruling.

We, therefore, grant petitioner's writ and hereby prohibit the respondents from implementing the family law master system.

Writ granted.

McGRAW, Justice, dissenting:

When confronted with constitutional challenges to statutory enactments, this Court has exercised considerable restraint through the application of the doctrine of least intrusive remedy. This Court held, for example, in Syllabus Point 4 of State ex rel. Alsop v. McCartney, 159 W.Va. 829, 228 S.E.2d 278 (1976), that "under the doctrine of least obtrusive remedy this Court will not strike down otherwise constitutional legislation when there is an adequate remedy to prevent such legislation from being unconstitutionally applied." See also Bailey v. Truby, 174 W.Va. 8, 321 S.E.2d 302, 306 (1984); Anderson's Paving, Inc. v.

Hayes, 170 W.Va. 640, 295 S.E.2d 805, 807 (1982); Don S. Co. v. Roach, 168 W.Va. 605, 285 S.E.2d 491, 496 (1981); State ex rel. S.M.B. v. D.A.P., 168 W.Va. 455, 284 S.E.2d 912, 916 (1981); Weaver v. Shaffer, 170 W.Va. 107, 290 S.E.2d 244, 249–51 (1980); Waite v. Civil Service Commission, 161 W.Va. 154, 166, 241 S.E.2d 164, 170–71 (1977); State ex rel. Whitman v. Fox, 160 W.Va. 633, 642–43, 236 S.E.2d 565, 571 (1977); State ex rel. Harris v. Calendine, 160 W.Va. 172, 176–80, 233 S.E.2d 318, 322–24 (1977). In the instant proceeding, the only changes needed to permit the statute in question to pass constitutional muster would be to place the Family Law Masters squarely in the Department of Human Services and to permit a de novo appeal of their determinations to the circuit courts. Clearly, this would further, not frustrate, the intent of the Legislature in enacting a comprehensive domestic relations bill and would avoid the loss of sorely needed federal funds. It is interesting that the majority asserts deference to the Legislature as a reason for effectively negating the unequivocal intent of the Legislature. Because the role of courts is often one of reconciliation between conflicting constitutional law and statutory law, I dissent from the adoption of the most intrusive remedy by the majority.

MILLER, Chief Justice, dissenting:

Justice McGraw has pointed out in his dissenting opinion that this Court could have obviated the constitutional infirmity in this important legislation by simply placing the family law masters in the Department of Human Services, which was already required to pay their salaries, W.Va. Code, 48A–4–1(e) (1986), and by construing W.Va. Code, 48A–4–9 (1986), to authorize a de novo review of their rulings in the circuit court. I write separately to more fully explain my reasons for believing that Article 4 of the Family Obligations Enforcement Act, W.Va. Code, 48A–1–1, et seq., establishing family law masters, should not have been declared unconstitutional.

3. See, e.g., J.M.S. v. H.A., 161 W.Va. 433, 436, 242 S.E.2d 696, 697 (1978) (custody and visita- tion rights).

I believe, with all respect, that the majority's reasoning is fallacious. They are correct in saying, and no one has ever argued to the contrary, that circuit courts have original jurisdiction over all civil cases in equity. Where the majority goes astray is in concluding that the legislation impermissibly "divests" circuit courts of jurisdiction granted by Article VIII, Section 6 of the West Virginia Constitution.

It is not necessary to laboriously review the history of our divorce law. No one disputes what this Court stated in *State ex rel. Watson v. Rodgers*, 129 W.Va. 174, 176, 39 S.E.2d 268, 269 (1946):

> "[I]n this jurisdiction divorce has always been governed by statute. West Virginia Code 1868, Chapter 64. As stated ... in *Boger v. Boger*, 86 W.Va. 590, 104 S.E. 49 [1920], 'The Statute [Barnes Code, Chapter 64] is not amendatory of the common law or the ecclesiastical law. It is full, complete and comprehensive, covering every phase of divorce; wherefore it was manifestly designed by the Legislature to be a substitute for all other law applicable to that subject'"

*See* H. Clark, Law of Domestic Relations §§ 2.1, 2.2 (1968).

The constitutional provision defining the jurisdiction of circuit courts is thus not the source of the authority to grant divorces or to make decrees concerning child support or alimony. This power is given by statute. The legislature has plenary power to pass, amend, and repeal provisions of the domestic relations law, a power which it has not infrequently exercised over the years. *See State ex rel. Watson v. Rodgers, supra; Boger v. Boger, supra.*

The jurisdiction of circuit courts granted by our Constitution is not infringed upon by revisions of our divorce laws. The constitutional jurisdiction of circuit courts, for example, was not enlarged by legislative action permitting divorces to be granted on the ground of irreconcilable differences. Nor would its jurisdiction be diminished if that ground for a divorce were eliminated.

Only subject matter jurisdiction was changed. The act does not impair or restrict the original or general jurisdiction of a circuit court in the constitutional sense. If anything, the involved legislation would seem to "facilitate the public's interest in just, speedy and inexpensive determinations" of these critically important disputes. *Arlan's Dept. Store of Huntington v. Conaty*, 162 W.Va. 893, 898, 253 S.E.2d 522, 525 (1979).

It must be remembered that under this legislation, actions for divorce are still filed in the circuit court. The change brought about was the creation of the position of a family law master to hear matters surrounding divorce, custody, child support, and related matters. It is analogous to some extent with the previous divorce commissioner system authorized by W.Va. Code, 48-2-24, -25, and -26, except that reference to the family law master is automatic.

The critical issue is not one of "usurpation," but whether a family law master under this legislation will be exercising judicial powers in violation of the doctrine of the separation of powers contained in Article V, Section 1 of our Constitution, which states:

> "The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature." [1]

The majority avoids discussing this issue for reasons that are inexplicable to me. There is a well developed body of law in this area that could have set the guidelines and provided a proper resolution of this issue. However, the majority has chosen to ignore it.

We discussed the separation of powers doctrine at some length in *Appalachian Power Co. v. Public Service Comm'n*, 170

---

1. This is reinforced by Article VIII, Section 1 of our Constitution which provides: "The judicial power of the State shall be vested solely in a supreme court of appeals and in the circuit courts ... and magistrate courts ... and in the justices, judges and magistrates of such courts."

W.Va. 757, 296 S.E.2d 887 (1982). There we invalidated a statute delegating broad powers of contempt to the Public Service Commission on the basis that it delegated judicial powers to an administrative agency, thereby, violating the separation of powers clause. We recognized in Syllabus Point 1, however, that: "The Legislature may create an administrative agency and give it quasi-judicial powers to conduct hearings and make findings of fact without violating the separation of powers doctrine." *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

In *Appalachian Power,* we indicated that only direct and fundamental encroachments by one branch into the traditional powers of another branch violate the separation of powers doctrine and we "recognized the need for some flexibility in interpreting the separation of powers doctrine in order to meet the realities of modern day government and particularly the proliferation of administrative agencies." 759 W.Va. at 170, 296 S.E.2d at 889. *See also Chapman v. West Virginia Housing Authority,* 121 W.Va. 319, 3 S.E.2d 502 (1939); *Wheeling Bridge T. Ry. Co. v. Paull,* 39 W.Va. 142, 19 S.E. 551 (1894).

We also pointed out in *Appalachian Power* that although the United States Constitution does not contain an express separation of powers clause, the same prohibition applies on the federal level as a result of the "constitutional language separating and vesting legislative, executive, and judicial power in the three departments of government." 170 W.Va. at 758, 296 S.E.2d at 888.

Of particular relevance to the present issue is *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), where the Supreme Court upheld the constitutionality of a 1976 amendment to the Federal Magistrates Act. This amendment permitted federal district court judges to refer pretrial motions, including various "dispositive" motions in criminal cases, to a

magistrate for an evidentiary hearing and for proposed findings and recommendations. As to these dispositive motions, the Act required the district court to make a de novo determination of the magistrate's proposed findings and recommendations to the extent an objection was made. Other pretrial determinations of the magistrate were subject to reconsideration if they were contrary to law or clearly erroneous.

The Supreme Court found that this congressional delegation of authority to federal magistrates, who are not appointed for life, did not violate Article III of the United States Constitution which reposes the judicial power in the federal courts, because the ultimate decision was made by the district court. This conclusion was reached even though the district court judges, under the statute, were not required to conduct new hearings on contested issues where an objection was made to the magistrate's findings or recommendations. Furthermore, the statute provided that if the magistrate's ruling was not contested it became final. The Court's key holding was that the district judges were free to make the ultimate determination:

> "Thus, although the statute permits the district court to give to the magistrate's proposed findings of fact and recommendations 'such weight as [their] merit commands and the sound discretion of the judge warrants,' *Mathews v. Weber,* [423 U.S. 261, 275, 46 L.Ed.2d 483, 494, 96 S.Ct. 549, 556 (1976)] that delegation does not violate Art. III so long as the ultimate decision is made by the district court." 447 U.S. at 683, 100 S.Ct. at 2416, 65 L.Ed.2d at 438.

The Supreme Court had previously upheld referrals of social security benefit cases to federal magistrates for a preliminary review of the administrative record, oral argument, and preparation of a recommended decision in *Mathews v. Weber,* 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). This case also recognized that the federal district judge retained the ultimate authority to decide the case.[2]

2. In contrast to *Raddatz* and *Mathews,* the United States Supreme Court found that the appoint-

ment of bankruptcy judges under the 1978 Bankruptcy Act violated Article III of the United

In a closely analogous situation, the Supreme Court of Delaware in *A.L.W. v. J.H.W.*, 416 A.2d 708 (Del.1980), in order to avoid a possible constitutional problem with delegating judicial authority to family court masters, construed its statute and one of its family court rules as not authorizing masters to exercise final judicial power:

> "In our opinion, nothing in this statutory plan or procedure authorizes a Master to immediately and finally enter a decree divorcing the parties.... He may only make findings and recommendations which, by operation of law under the Statute, ripen into a judgment of the Court, (a) if a hearing is not requested by a party, or (b) the Chief Judge does not disapprove such findings and recommendations.

> "In effect, this procedure permits a Master to enter a decree *nisi*, that is, an order which will become final unless one of the two specified events occurs. The significance of the waiting period is underscored by the specific language of § 913(c) which provides that it is only after the time period has run that the findings and recommendations of the Master become 'the judgment of the Court.' That judgment becomes final by the entry of a divorce decree by the Court. 13 *Del.C.* § 1518....

> "Plaintiff relies upon Family Court Rule 380(f), which provides that a 'Master's judgment [in an uncontested divorce action] shall be final upon entry subject only to a right of appeal in accordance with 10 *Del.C.* § 960.' ... A Master does not have the power to enter a 'judgment' and the fundamental mistake that Family Court made in this case was to base its ruling on the premise that the Master who entered the decree did have such power. To so interpret the Rule would, in effect, permit the Court to delegate its judicial power to a Master in violation of the governing Statutes. The Judges of the Family Court, in the exercise of the rulemaking power or otherwise, may not delegate judicial authority of the performance of judicial acts, 46 *Am.Jur.2d* Judges § 23. That limitation is emphasized in the discussion of a master in equity at 30A *C.J.S.* Equity § 521:

> 'Certainly the Court cannot delegate to him [the master] judicial powers, and the performance of judicial duties which it alone can exercise; and, in the sense that he can make no final determination of a judicial matter, since all his acts become binding only being approved and adopted by the court, he is not a judicial but a ministerial officer.'

> And see the Delaware Constitution, *Art. IV* § 1, as to the vesting of judicial power." 416 A.2d at 711.

Much the same issue in a more egregious form was before the Supreme Court of Indiana in *State ex rel. Smith v. Starke Circuit Court*, 275 Ind. 483, 417 N.E.2d 1115 (1981). There the legislature had created master commissioners who were given full jurisdiction over probate, civil, and criminal cases. The court held this violated the separation of powers doctrine and after reviewing some of its earlier decisions concluded:

> "Clearly, in light of these principles, a master commissioner can act as an 'instrumentality' to inform and assist the court by conducting hearings and reporting facts or conclusions to the court, but only the court has 'the inherent authority not only to decide, but to make binding orders or judgments....' [*Underwood v. McDuffee*, 15 Mich. 361, 368 (1867)]." 275 Ind. at 494, 417 N.E.2d at 1121.

Certainly, in view of these federal and state authorities, it would require no great feat of legal interpretation to construe the

States Constitution in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The Bankruptcy Act had vested plenary authority in the bankruptcy judges to hear all matters connected with a bankruptcy with no oversight by a federal judge except by way of an appeal. They were not appointed for life and were subject to diminution of salary during their term of office. It is these requirements that are the hallmark of an Article III judicial officer under the United States Constitution. The Supreme Court concluded they could not exercise such judicial powers unless they were appointed for life and were not subject to having their salary diminished as required by Article III.

language of W.Va.Code 48A–4–9 (1986), which governs the judicial review of a family law master's final order, to authorize a de novo review and thereby avoid the separation of powers obstacle. Under this section, the circuit court has the express power to "determine the appropriateness of the terms of the master's final order" and could reverse the recommendation of the family law master or enter an appropriate order based on the law and the evidence previously developed.

Like the Delaware Supreme Court, I would interpret the statutory provisions relating to the master's "final orders" so they would not be immediately enforceable. The family law master's authority would be much like the existing system for divorce commissioners. Under W.Va.Code, 48–2–25, the circuit court receives and must consider the findings of fact and recommendations of the commissioner in passing on the merits of any issue on which the court has requested a recommendation. We recognized in *Currence v. Currence,* 123 W.Va. 599, 607, 18 S.E.2d 656, 660 (1941), that a circuit court judge could not under the statute delegate his judicial authority to the commissioner to make the actual decision in the case, and emphatically stated: "Such a delegation of his duty to determine the case, no court could make." *See also Bordelon v. Louisiana Dept. of Corrections,* 398 So.2d 1103 (La.1981); *Biel v. Biel,* 114 Wis.2d 191, 336 N.W.2d 404 (1983).

Despite the majority's rather pious pronouncement that "[i]t is not the function of this Court ... to redraft acts of the legislature," it has failed to come to grips with a rather simple task of interpreting the circuit court's role in this legislation. Not only has it failed to cite any of the foregoing relevant authority, but it has ignored our established rule of statutory construction found in Syllabus Point 3 of *Underwood Typewriter Co. v. Piggott,* 60 W.Va. 532, 55 S.E. 664 (1906): "Whenever an act of the legislature can be so construed and applied as to avoid conflict with a constitutional provision, and give it the force of law, such construction will be adopted." *See also Thomas v. Rutledge,* 167 W.Va. 487, 280 S.E.2d 123 (1981); *State ex rel.*

*City of Charleston v. Coghill,* 156 W.Va. 877, 207 S.E.2d 113 (1973); *Farley v. Graney,* 146 W.Va. 22, 119 S.E.2d 833 (1960).