STATE OF WEST VIRGINIA, *ex rel.*, HAROLD K. WHITMAN,
JACK HOBBS, VERNON DINGESS, *and* ANTHONY P. CRISTIANI

*v.*

THE HONORABLE FRED L. FOX, II

*Judge* OF THE CIRCUIT COURT OF LOGAN COUNTY,

WEST VIRGINIA

(No. 13951)

*and*

STATE OF WEST VIRGINIA, *ex rel.*, ROY STOLLINGS,

AMOS GODBY *and* BETTY LUMSFORD

*v.*

THE HONORABLE FRED L. FOX, II

*Judge* OF THE CIRCUIT COURT OF LOGAN COUNTY,

WEST VIRGINIA

(No. 13958)

Decided July 15, 1977.

634

*Grubb & Spaulding, Bernard L. Spaulding* for Stollings, et al.

*Barrett, Chafin & Lowry, Lafe C. Chafin, Ray L. Hampton, II* for Whitman, et al.

*Chauncey H. Browning,* Attorney General and Special Prosecuting Attorney, *Willard A. Sullivan, Jr.,* Assistant Attorney General and Assistant Special Prosecuting Attorney, *Paul R. Goode, Jr.,* Special Assistant Attorney General and Assistant Special Prosecuting Attorney, *Mullins, John R. Fowler,* Assistant Special Prosecuting Attorney, *Love, Wise, Robinson & Woodroe, Larry J. Gonzales* for respondent.

NEELY, JUSTICE:

These are two original proceedings in prohibition presenting important issues in the administration of the criminal law which the Court consolidated for argument and disposition because of identical questions of law.

On December 15, 1976 a special grand jury sitting in and for the Circuit Court of Logan County, West Virginia, returned a multiple count, joint indictment against Harold K. Whitman, Jack Hobbs, Vernon Dingess, and Anthony P. Cristiani, and another multiple count, joint indictment against Roy Stollings, Amos Godby and Betty Lunsford, both of which indictments charged violations of *W. Va. Code*, 61-10-31 (1971), *W. Va. Code*, 3-9-1 (1963), *W. Va. Code*, 3-9-9 (1963), *W. Va. Code*, 3-9-10 (1963), and *W. Va. Code*, 3-9-12 (1963).[1]

---

[1] We are primarily concerned in this opinion with the offense of conspiracy to defraud the State, charged under *W. Va. Code*, 61-10-31 (1971). The relevant part of the indictments charging that offense are set forth for the reference as follows:

STATE OF WEST VIRGINIA
COUNTY OF LOGAN, to-wit:

The Special Grand Jurors of the State of West Virginia, in and for body of the County of Logan, and now attending the Circuit Court of said County, upon their oaths present that Harold K. Whitman, Jack Hobbs, Vernon Dingess and Anthony P. Cristiani on the 11th day of May, 1976, in the said County of Logan, did unlawfully and feloniously conspire to defraud the County of Logan, in the State of West Virginia, and one or more of such persons did act to effect the object of the conspiracy, in that the said Harold K. Whitman, Jack Hobbs, Vernon Dingess and Anthony P. Cristiani did agree and conspire to deprive the County of Logan of its right to the honest, faithful and conscientious performance of its commissioners of election at the Striker #2 precinct during the May 11, 1976 primary election, free from corruption, partiality, improper influence and dishonesty and the said Vernon Dingess and Jack Hobbs did act to effect the object of the conspiracy in that the said Vernon Dingess did bribe voters, one of whom was Ernest Adams, and the said Jack Hobbs did deceive and intimidate voters, one of whom was Loretta T. Shadd, to defraud the voters of their right of suffrage and to require voters, including the said Loretta T. Shadd, to vote for candidates other than the candidates for whom said voters intended to vote, against the peace and dignity of the State.

STATE OF WEST VIRGINIA
COUNTY OF LOGAN, to-wit:

The Special Grand jurors of the State of West Virginia, in and for the body of the County of Logan, and now attending the Circuit Court of said County, upon their oaths present that Roy Stollings, Amos Godby and Betty Lumsford on the 11th day of May, 1976, in the said County of Logan, did unlawfully and

The Honorable H. Harvey Oakley, Judge of the Circuit Court of Logan County, disqualified himself from presiding over the Special Grand Jury called to investigate alleged election irregularities, and consequently, by order of this Court the Honorable Fred L. Fox, II, Judge of the Circuit Court of Marion County was temporarily assigned under *West Virginia Constitution*, Art. VIII, § 3, to the Logan County Circuit to hear all matters resulting from the Special Grand Jury investigations.

We granted a rule to show cause in prohibition to determine whether *W. Va. Code*, 61-10-31 (1971), the West Virginia conspiracy statute, is constitutional; whether the circuit court acted outside its jurisdiction in denying the petitioners' motion for severance and separate trials; whether the indictments alleging violations of *W. Va. Code*, 3-9-1 (1963) are sufficient as a matter of law; and, whether the Special Grand Jury of Logan County was constitutionally selected.

I

The first question before us is whether the initial felony count in the indictments alleging the violation of *W. Va. Code*, 61-10-31 (1971) can withstand challenge on the grounds that the statute under which it is drawn is unconstitutional. *W. Va. Code*, 61-10-31 (1971) says:

It shall be unlawful for two or more persons to conspire (1) to commit any offense against the

---

feloniously conspire to defraud the County of Logan, in the State of West Virginia, and one or more of such persons did act to effect the object of the conspiracy in that the said Roy Stollings, Amos Godby and Betty Lumsford did agree and conspire to deprive the County of Logan of its right to the honest, faithful and conscientious performance of its commissioners of election at the Layne School #4 precinct during the May 11, 1976 primary election, free from corruption, partiality, improper influence and dishonesty and the said Roy K. Stollings did act to effect the object of the conspiracy in that the said Roy Stollings did deceive and intimidate voters, one of whom was Roy Elkins, to defraud the voters, including Roy Elkins, of their right of suffrage and to require voters, including the said Roy Elkins, to vote for candidates other than the candidates for whom said voters, including the said Roy Elkins, intended to vote, against the peace and dignity of the State.

State or (2) to defraud the State, the state or any county board of education, or any county or municipality of the State, if, in either case, one or more of such persons does any act to effect the object of the conspiracy.

Nothing in this section shall be construed to supersede, limit, repeal or affect the provisions of section eight [§ 3-9-8], article nine, chapter three; section two [§ 5-1-2], article one, chapter five; section thirty-eight [§ 5A-3-38], article three, chapter five-A; section seven [§ 20-7-7], article seven, chapter twenty; section sixteen [§ 60-6-16], article six, chapter sixty; sections seven, eight, nine and ten [§§ 61-6-7 to 61-6-10], article six, chapter sixty-one; or section one [§ 62-8-1], article eight, chapter sixty-two; all of this Code. It shall not be a defense to any prosecution under this section thirty-one that the conduct charged or proven is also a crime under any other provision or provisions of this Code or the common law.

Any person who violates the provisions of this section by conspiring to commit an offense against the State which is a felony, or by conspiring to defraud the State, the state or any county board of education, or any county or municipality of the State, shall be guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the penitentiary for not less than one nor more than five years or by a fine of not more than ten thousand dollars, or, in the discretion of the court, by both such imprisonment and fine. Any person who violates the provisions of this section by conspiring to commit an offense against the State which is a misdemeanor shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished by confinement in the county jail for not more than one year or by a fine of not more than one thousand dollars, or, in the discretion of the court, by both such confinement and fine.

We find that the crime denominated as "(2) to defraud the State, the state or any county board of education, or any county or municipality of the State, . . ." is void for

vagueness because it does not adequately inform the citizenry of the activity which may be considered criminal under the statute. This part of the statute sets forth the law in language which no man can understand. The same deficiency, however, does not apply to the provision which makes it unlawful for two or more persons to conspire "(1) to commit any offense against the State . . ." because the specific offenses are defined by statutory or common law.

Within the last three years this Court has struck down in whole or in part three other criminal statutes in this State on due process grounds, namely *W. Va. Code*, 49-1-4 (1941) concerning the definition of "delinquent child," *State v. Flinn* ___ W. Va. ___, 208 S.E.2d 538 (1974); *W. Va. Code*, 61-3-20 (1929), the embezzlement statute, *State ex rel. Cogar v. Kidd*, ___ W. Va. ___, 234 S.E.2d 899 (1977); and *W. Va. Code*, 61-6-7 (1923), the "Red Men's Act," *Pinkerton v. Farr*, ___ W. Va. ___, 220 S.E.2d 682 (1975). The reason for striking down the definition of "delinquent child" was vagueness, and the reason for striking down parts of the embezzlement statute and the "Red Men's Act" was the existence in those statutes of unconstitutional presumptions. All three cases stand for the proposition that this Court will not be lax in the protection of individual rights when there is a constitutional infirmity in a statute, regardless of how laudatory are the motives of the Legislature.

While we recognize that *W. Va. Code*, 61-10-31 (1971) is modeled on a similar federal conspiracy statute, 18 U.S.C., § 371 [1948], and while we further recognize that the counterpart federal conspiracy statute has miraculously withstood constitutional scrutiny, we must still determine whether our own statute is constitutional under *West Virginia Constitution*, Art. III, § 10, the due process clause, in light of this State's long constitutional tradition of protecting individual rights. As we said in syl. pt. 1 of *State v. Flinn, supra:*

"A criminal statute must be set out with sufficient definiteness to give a person of ordinary intelligence fair notice that his contemplated

conduct is prohibited by statute and to provide adequate standards for adjudication."

The part of the conspiracy statute covering defrauding the State does not meet this test. While we do not disparage the Federal Courts' wisdom in permitting the word "defraud" in 18 U.S.C., § 371 [1948] to take on expanded meaning with successive imaginative prosecutions, we believe that to permit such a course of conduct in this State would be an abomination to all free men and would come close to providing a just cause for insurrection. *West Virginia Constitution,* Art. III, § 3; *Montani Semper Liberi.* If we upheld the part of the conspiracy statute under consideration, we would be accessories to the creation of a vehicle for great prosecutorial mischief. While a well trained lawyer might be able to grasp the breadth of imaginable evil-doing which has been prosecuted under the federal conspiracy statute, and thus take notice that he would be liable to prosecution at the caprice of any prosecutor, the man of ordinary intelligence to which the syllabus of *Flinn* refers would not.

The word "defraud" can be used under so many circumstances to denote the perpetration of evil that it is almost as broad as the word "evil" itself.[2] Clearly we

---

[2] The *Oxford English Dictionary* (1969) defines "defraud" as follows:

1. To deprive (a person) by fraud of what is his by right, either by fraudulently taking or by dishonestly withholding it from him; to cheat, cozen, beguile.

2. *fig.* To deprive or cheat (a thing) of what is due to it; to withhold fraudulently.

To understand this definition, one must know the meaning of "fraudulently," which the same dictionary defines as, "In a fraudulent manner, by fraud, with intent to defraud or deceive, dishonestly, wrongfully." Ultimately an understanding of these words requires a definition of the common root word, "fraud," which the same dictionary defines as follows:

1. The quality or disposition of being deceitful; faithlessness, insincerity. Now rare.

2. Criminal deception; the using of false representations to obtain an unjust advantage or to injure the rights or interests of another.

would not uphold a statute which provided "any person who shall commit evil within the State of West Virginia shall be guilty of a felony." Such a statute would not give definite notice to the citizenry of what specific acts were considered by the Legislature to be worthy of criminal sanctions at the time the statute was passed. Many types of human conduct are reprehensible without being criminal. Obviously the conspiracy statute under consideration was designed to punish certain common types of reprehensible conduct in the administration of government. We are mindful of the need to discourage fraud in the conduct of elections, bribery of government officials, payments to government agents for the award of contracts, and conspiracies to exact government benefits on behalf of persons not rightfully entitled by law to such benefits. However, it is an elementary exercise in legislative drafting to devise statutes which specifically cover all of the types of conduct which the Legislature seeks to prohibit.[3] Statutes are not struck down on con-

---

3. An act or instance of deception, an artifice by which the right or interest of another is injured, a dishonest trick or stratagem.

4. A method or means of defrauding or deceiving; a fraudulent contrivance; in mod. colloq. use, a spurious or deceptive thing.

Apart from the definitional circularity that would confound a person seeking to determine his exposure to criminal liability under the "defrauding" portion of West Virginia's conspiracy statute, these definitions sweep wide enough to encompass almost any conduct the State might without specific advance warning consider wrongful.

[3] The drafters of the *Model Penal Code,* for example, evidently found overly broad definitions of conspiracy to be defective and limited their definition to where the objective of the conspiracy is a crime, thus eliminating any expansive "defrauding" conspiracy definition, such as found in West Virginia's conspiracy statute. The drafters' proposed definition is set forth in § 5.03(1) of the *Model Penal Code,* Criminal Conspiracy:

(1) *Definition of Conspiracy,* a person is guilty of conspiracy with another person or person(s) to commit a crime if with the purpose of promoting or facilitating its commission he:

(a) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes

stitutional grounds because they are long, detailed, or elaborately specific; they are struck down because they are vague.

In the cases before us the other courts in the indictments are brought under specific sections of the *W. Va. Code,* concerning the conduct of elections, in which criminal conduct is described in detail and the penalties for each criminal act specifically set forth. The conspiracy statute, as interpreted by the prosecution, would give an expansive meaning to the words "to defraud the State," and would make it possible to convert behavior which the Legislature has seen fit to make a misdemeanor into a felony whenever two or more persons engage in it in concert. This may have been the intent of the Legislature, but one cannot be sure from the use of such a

such crime or an attempt or solicitation to commit such crime; or
   (b) agrees to aid such other person or person(s) in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
*Model Penal Code,* § 5.03 (Proposed Official Draft, 1962). Commentators approve this approach—that, while there exist some acts which should be criminal only if engaged in by a group, these should be substantively defined and not left to be remedied by vague conspiracy provisions. *See* H. Wechsler, W. Jones and H. Korn, *The Treatment of Inchoate Crimes In The Model Penal Code of the American Law Institute: Attempt, Solicitation and Conspiracy,* 61 Col. L. Rev. 957 (1961).
   It is also worth noting that the Criminal Code Reform Act of 1977 (introduced as Senate Bill 1437, co-sponsored by Senators McClellan and Kennedy) revising Title 18 of the *U.S. Code,* known as the Federal Criminal Code, is now pending in Congress; the Senate Judiciary Committee is holding hearings relating to it. The drafters of this reform proposal have eliminated the "defrauding" portion of the conspiracy statute and limited the new definition of conspiracy to conduct which, if performed, would be a criminal offense. The relevant portion of the Reform Act states:
   § 1002 Criminal Conspiracy
      (a) Offense.
      A person is guilty of an offense if he agrees with one or more persons to engage in conduct, the performance of which would constitute a crime or crimes, and he or one of such persons in fact engages in any conduct with intent to effect any objective of the agreement.

vague word as "defraud". The theory of the other part of the statute involving the commission of an offense against the State is that conspiracy to commit a felony is a felony and conspiracy to commit a misdemeanor is a misdemeanor. In the statute the word "defraud," under the interpretation which is urged upon us by the State, would apply equally both to felonies and to misdemeanors, and we can imagine that over-zealous prosecutors, possibly from impure motives, would seek to convert myriad misdemeanors into felonies by devising some theory which would suggest common action by at least two individuals and some possible detriment to the government in addition to the standard violation of its peace and dignity.[4]

Accordingly we hold that all provisions of *W. Va. Code*, 61-10-31 (1971) referring to conspiracies "to defraud the

---

[4] The experience on the federal level with the "defrauding" portion of the federal conspiracy statute justifies our concern with the improper uses to which imaginative, over-zealous prosecutors might put such a broad, vague statute as that under consideration here. The situation as it has evolved on the federal level is well documented by Professor Abraham S. Goldstein in Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L. J. 405 (1959) and aptly described as follows:

"Conspiracy to defraud the United States" has evolved in several stages. First, it was a crime reaching only agreements to use falsehood to induce action by the Government which would cause it a loss of money or property. It expanded to include an agreed-upon falsehood which might disadvantage the Government in any way whatever, and ultimately covered virtually any impairment of the Government's operating efficiency. The end to be gained having thus been obscured, it remained only for the means to be made equally shadowy. This was accomplished in the cases which viewed any dishonest act, including concealment, as the measure of an interference with the Government. Suspiciously unethical conduct, the failure to disclose even that which Congress had never required to be disclosed, became the raw material from which criminal liability was fashioned. *Id*, at 461-462.

Such abuses shall not be permitted to take hold here, and our own prosecutors shall not be encouraged to devise even more exotic and oppressive applications of the "defrauding" portion of West Virginia's conspiracy statute which the linguistic analysis in footnote 2 (above) suggests are possible.

State, the state or any county board of education, or any county or municipality of the State," are unconstitutionally vague, however, under the doctrine of the least obtrusive remedy we see no need to strike down the entire statute when the constitutionally offensive part of it is severable. *State ex rel. Harris v. Calendine,* ___ W. Va. ___, 233 S.E.2d 318 (1977); *State ex rel. Cogar v. Kidd,* ___ W. Va. ___, 234 S.E.2d 899 (1977). Therefore, so much of the statute as concerns conspiracy to commit offenses against the State is valid and in continued force and effect.

## II

Petitioners made a motion before the trial court below for separate trials which was denied in the interest of the "financial and other costs to the State of West Virginia and Logan County, as well as the time burden upon police officers, prosecuting officials, jurors and the judge and . . . the time and financial cost defendants can spend in waiting for speedy disposition of these cases . . ." The trial court did, however, order that each defendant receive six strikes from the jury panel in an attempt to avoid the prejudice in joint trials inherent in reducing the number of peremptory challenges for each defendant.

Both the case of *State ex rel. Zirk v. Muntzing,* 146 W. Va. 349, 120 S.E.2d 260 (1961) and basic concepts of fairness dictate that every individual has a right to a separate trial at which the primary focus is upon his individual guilt or innocence. This has been our longstanding interpretation of *W. Va. Code,* 62-3-8 (1923) which says:

> Persons indicted and tried jointly, for a felony, shall be allowed to strike from the panel of jurors not more than six thereof, and only such as they all agree upon shall be stricken therefrom; and if they cannot agree upon the names to be so stricken off, the prosecuting attorney shall strike therefrom a sufficient number of names to reduce the panel to twelve. If persons jointly indicted elect to be, or are, tried separately, the

panel in the case of each shall be made up as provided in the third section [§ 62-3-3] of this article.

The holding of syl. pt. 1 of *Zirk, supra* is:

"Upon a joint indictment for a felony, any one of the persons jointly indicted may, under *Code*, 1931, 62-3-8, elect to be tried separately.

We find that syllabus point controlling and we further find that it comports with fair procedure and common sense.[5] There are numerous occasions on which the de-

---

[5] West Virginia's rule, under which a defendant may elect to be tried separately upon a joint indictment in felony cases, represents the most advanced thinking in this area of criminal procedure, and the majority of jurisdictions are not so protective of defendants' rights. Nonetheless, the concerns that underlie our rule are the same everywhere, even though the defendant's severance may in some places be a matter within the trial court's discretion rather than a matter of right for the defendant. A good general statement of these concerns appears in American Bar Association Project on Standards for Criminal Justice, *Standards Relating to Joinder and Severance*, (approved draft 1968). Standard 2.3 Severance of Defendants, states:

(a) When a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to him but is not admissible against him, the court should determine whether the prosecution intends to offer the statement in evidence at the trial. If so, the court should require the prosecuting attorney to elect one of the following courses:

(i) a joint trial at which the statement is not admitted into evidence;

(ii) a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been [effectively] deleted, *provided that, as deleted, the confession will not prejudice the moving defendant;* or

(iii) severance of the moving defendant.

(b) The court, on application of the prosecuting attorney, or on application of the defendant other than under subsection (a), should grant a severance of defendants whenever:

(i) if before trial, it is deemed necessary to protect a defendant's right to a speedy trial, or it is deemed appropriate to promote a fair determination of the guilt or innocence of [a] *one or more* defendants; or

(ii) if during trial upon consent of the [severed] defendant *to be severed,* it is deemed necessary to achieve a fair deter-

mands for fair procedure conflict with the desirable public policy of economy of effort and money. In the criminal law, however, an individual's interest in his freedom far outweighs the State's interest in efficiency. Every member of this Court has had occasion to observe joint trials and it is obvious to anyone with that experience that a joint trial denies each particular accused the type of focus on his own conduct which fundamental fairness would require. Joint trials cannot help but raise the specter of conviction through guilt by association. We have recently held that except in cases of prior convictions for perjury or false swearing, a defendant cannot be convicted through guilt by association even with himself, and we have declined to permit admission into evidence of prior convictions. *State v. McAboy*, _____ W. Va. _____, 236 S.E.2d 431 (1977).

---

mination of the guilt or innocence of [a] *one or more* defendants.

(c) When such information would assist the court in ruling on a motion for severance of defendants, the court may order the prosecuting attorney to disclose [to the court in camera] any statements made by the defendants which he intends to introduce in evidence at the trial.

(The standard is reproduced above as approved. However, the Advisory Committee on the Criminal Trial has proposed changes in the wording of the standard. The Committee's proposed deletions appear in brackets, and proposed additions are underlined, in the above-quoted text.)

The Commentary to § 2.3 outlines some of the situations, other than the admission of codefendants' statements, in which a defendant may be prejudiced by joint trial with others. These situations concern:

(1) whether the number of defendants or the complexity of the evidence as to the several defendants is such that the trier of fact probably will be unable to distinguish the evidence and apply the law intelligently as to the charges against each defendant; (2) whether evidence not admissible against all defendants probably will be considered against a defendant notwithstanding admonitory instructions; and (3) whether there are antagonistic defenses. *Standards, supra*, at 40.

For another view of this difficult problem, with particular emphasis on the crime of conspiracy, *see Model Penal Code*, § 5.03(4)(b) and the commentary thereto.

Furthermore, trials with multiple defendants tend to degenerate into disorderly circuses in which the battle among lawyers, because of the conflict of interest among defendants, places a substantial obstacle in the path of the jury's ability to determine ultimate facts. While jointly indicted persons may still knowingly, intelligently, and voluntarily acquiesce in joint trials, we hold that a court does not have jurisdiction in a criminal case to try jointly those defendants who choose to be tried separately.

## III

The petitioners assert that the indictments for violation of *W. Va. Code*, 3-9-1 (1963) are insufficient because they fail to set forth the exact manner by which the defendants allegedly made false returns. A representative count in the indictments for violations of *W. Va. Code*, 3-9-1 (1963) is as follows:

### THIRD COUNT

The said Harold K. Whitman, on the 11th day of May, 1976, in the said County of Logan, did unlawfully and feloniously and knowingly make, while serving, being and having been appointed an election commissioner, a false return of the result of the votes cast for a candidate, to-wit: candidate Vernon Dingess and others, at Striker #2 precinct during the May 11, 1976 primary election held pursuant to law, against the peace and dignity of the State.

*W. Va. Code*, 3-9-1 (1963) provides in relevant part:

"Every person named and identified in this section, who shall violate any of the provisions of the election laws as herein specified, shall be deemed guilty of a felony and, upon conviction thereof, shall be punished by imprisonment in the penitentiary for not less than one nor more than ten years:

(a) Any commissioner of election or poll clerk who shall knowingly make or cause to be made, or conspire with others to make, a false return of

the result of the votes cast for any candidate at any precinct in an election held pursuant to law; . . .

In support of petitioners' argument they cite *State v. Livesay*, 127 W. Va. 579, 34 S.E.2d 24 (1945), which held:

Election officials may make such false return of the results of the votes cast for any candidate in three ways: (1) By adding to the number of votes cast for a candidate; (2) by subtracting votes from the number cast for said candidate; and (3) by adding to the number of votes cast for the candidate's opponent. 127 W. Va. at 583, 34 S.E.2d at 26.

While *State v. Livesay, supra,* may have been good law in 1945, the case was decided before the passage of *W. Va. Code,* 62-1B-1 (1965), which provides for a bill of particulars. In West Virginia an indictment is sufficient that fairly apprises the accused of the nature of the charge against him.[6] Upon review of the indictments in the cases before us we find that they give fair notice of the offenses under *W. Va. Code,* 3-9-1 (1963) which the State intends to prove, and that any lack of specificity with regard to the details of the alleged violation are discoverable upon proper motion for a bill of particulars.

## IV

Finally, petitioners assert that all the indictments are void because the Special Grand Jury of Logan County did not represent a fair cross-section of the community and, consequently, was unconstitutionally selected. The transcript of the circuit judge's instructions to the jury commissioners, taken in its entirety, indicates that the circuit judge directed the jury commissioners to select good citizens regardless of their political affiliations.

---

[6] *See, e.g., State v. Casdorph,* ____ W. Va. ____, 230 S.E.2d 476 (1976), syl. pt. 1 of which states:

The test of the sufficiency of an indictment on appeal is whether it adequately informed the accused of the nature of the charge pending against him, and while it must allege every element of the offense, no particular form of words is required.

Further, the circuit court indicated that the commissioners could take the names from any reasonable source, but particularly authorized *selection from voter registration lists and from land books.*

This Court recognizes that almost all lists of citizens from whatever source tend to produce a bias of some sort because the lists have been prepared for some reason other than jury selection. Thus, telephone books disclose only those persons with telephones, land books disclose only those persons who own land, voter registration books disclose only those persons who are interested in voting, and welfare department lists disclose only those persons who have applied for welfare. In determining the fairness of a jury selection system the crucial question is whether members of identifiable groups in society have been either intentionally or unwittingly excluded.

The petitioners have not alleged that there was any methodical exclusion from the grand jury panel of any recognizable group of potential jurors, except persons who do not own land and do not vote. While the petitioners urge upon us, and we may infer, that persons who are *both* of low income and indifferent to the government process would appear on neither of these lists, there is no evidence that the jury commissioners failed to select a broad, representative sample of responsible citizens to sit on the grand jury panel. Petitioners, however, complain that to develop their case of bias they should have been given an opportunity to subpoena the jury commissioners to examine them concerning the jury selection process.

We see no valid reason for permitting yet one further opportunity for delay by making grand jury selection a routine subject for elaborate proceedings where the defendant has not alleged facts which, if true, would demonstrate a consistent course of conduct on the part of the jury commissioners tending to the exclusion of persons of a particular social class, race, sex, religion, or

caste from service on the grand jury. The mere absence of identifiable minority groups on any one panel is not, in and of itself, a constitutional violation. The controlling federal case in this context is *Castaneda v. Partida*, ____ U.S. ____, where the rule is stated as follows:

> ... in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial under-representation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. *Hernandez v. Texas*, 247 U.S. at 478-479. Next, the degree of under-representation must be proved by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. *Id.*, at 480. *See Norris v. Alabama*, 249 U.S. 587 (1935). This method of proof, sometimes called the 'rule of exclusion', has been held to be available as a method of proving discrimination in jury selection against a delineated class. *Hernandez v. Texas*, 347 U.S. at 480. Finally, as noted above, a selection procedure that is susceptible to abuse or not racially neutral supports the presumption of discrimination raised by the statistical showing. *Washington v. Davis*, 426 U.S. at 241; *Alexander v. Louisiana*, 405 U.S. at 630. Once the defendant has shown substantial under-representation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

Finding that the *Castaneda* standards are compatible with our own constitutional doctrine, we adopt those standards in West Virginia under *West Virginia Constitution*, Art. III, § 17 and under § 10, the due process clause with its inherent equal protection component. *See State ex rel. Harris v. Calendine*, ____ W. Va. ____, 233 S.E.2d 318 at 324 (1977). Applying these standards, we

find that the petitioners have not alleged that they are members of a recognizable group which has been excluded from or substantially under-represented on grand juries over a significant period of time. Consequently, under these standards, the defendants failed to make a *prima facie* case below of purposeful, invidious discrimination which would warrant a full hearing, including testimony by the jury commissioners with regard to their method of jury selection.

It is an ancient principle that a man is not to be judged by persons of classes lower than his own, whom it may be inferred will from jealousy be biased against him; thus, *"Unusquisque per pares suos est judicandus," Leg. Hen. Prim.* 31 § 7 (c. 1118) and then later the free man is not to be arrested, imprisoned, disseized, or destroyed *"nisi per legale judicium parium suorum vel legem terrae." Magna Carta.* (1215) By extension the principle has come to protect the individual from the bias of higher social classes, as well as castes determined by race, nationality, religion, etc. There is nothing, however, in the principle of its logical extension which gives a person the right, at his election, to be judged by the scrapings and leavings of life, whom we may infer might lack the intellectual competence to do justice and before whom all orderly procedure could well be farce. In the cases before us the circuit judge has not violated the tradition of the *Leges Henrici Primi, Magna Carta,* or their legitimate progeny.

For the foregoing reasons the writ of prohibition for which the petitioners pray shall issue prohibiting the Circuit Court of Logan County from proceeding to try petitioners upon the courts in the indictments alleging violation of *W. Va. Code,* 61-10-31 (1971) and further prohibiting the circuit court from trying any or all petitioners jointly unless one or more petitioners themselves make a motion for a joint trial.

*Writ as moulded awarded.*