Carol V. Mauck

*v.*

City Of Martinsburg, *etc., et al.*

(No. 14888)

Decided July 7, 1981.

*Loy, Shingleton & Caryl and Michael E. Caryl* for appellant.

*Rice, Hannis & Douglas, Richard L. Douglas and J. Oakley Seibert* for appellees.

NEELY, Justice:

In May of 1973 the appellant, Carol Mauck, was hired to act as cashier for the City of Martinsburg. In February 1976 appellee Eugene Dunworth, Jr., city manager of the City of Martinsburg, suspended the appellant from employment pending an investigation of missing funds. On 10 August 1976, appellant was found not guilty of embezzlement of the missing funds before a local jury. On 22 October 1976, having received inquiries from the appellant concerning her job status, Mr. Dunworth informed her by letter that she was dismissed as a city employee because: "(1) An embezzlement of some $10,000 occurred while you were city cashier. This indicates, at the least, incompetence and inefficiency in the performance of your duties. (2) You have demonstrated carelessness and negligence in the use of property of the city." Pursuant to the City of Martinsburg's *Personnel Rules and Policies,* Dunworth sent a copy of the letter of dismissal to the members of the City Council and the City Attorney.

In December 1977 appellant brought suit against Dunworth and the City of Martinsburg. The complaint alleged both breach of her employment contract and insulting words under *W. Va. Code,* 55-7-2 [1923]. After a jury verdict for the appellant, the trial court granted appellee's motion for a new trial on the breach of contract claim and entered judgment notwithstanding the verdict on the insulting words claim.[1] We affirm.

---

[1] The trial court's order does not clearly grant a judgment notwithstanding the verdict on the insulting words claim. However,

The trial court did not abuse its discretion in granting a new trial on the issue of the breach of the employment contract. The facts pertinent to the dismissal under the Martinsburg *Personnel Rules and Policies* are not clear from the present record, and can be better developed at a new trial. The granting of a judgment notwithstanding the verdict on the claim of insulting words, being a final judgment, deserves greater scrutiny. We affirm because, on the facts in the record, the statements made were protected under the doctrine of qualified privilege.

I

Before discussing the rule of privilege in this case, it is probably incumbent upon us to analyze West Virginia's insulting words statute, *W. Va. Code,* 55-7-2 [1923]. The statute comes from a Virginia statute first written in 1810 as an anti-dueling statute. Note, "Libel and Slander—The Innocent Construction Rule, "68 *W. Va. L.Rev.* 208 (1966). Apparently the theory upon which the original Virginia statute was predicated was that a victim of an insult would not feel obliged to challenge his verbal assailant to a duel if there were a legal remedy available. *See Barger v. Hood,* 87 W.Va. 78, 104 S.E. 280 (1920). Our statute, *W. Va. Code,* 55-7-2 [1923], in its entirety reads as follows:

> All words which, from their usual construction and common acceptation, are construed as insults and tend to violence and breach of the peace, shall be actionable. No demurrer shall preclude a jury from passing theron.

Since the law of both libel and slander was very well developed both here and in England by 1810,[2] this statute must have been intended to create a new cause of action; however, since it is silent on any modification of traditional

---

the wording of his memorandum opinion establishes that he intended such a resolution.

[2] As early as the twelfth century, actions for defamation were common in English local courts. If one called a man a "wolf" or a "hare" he would pay his victim three shillings. If one called a woman a "harlot" and could not prove the truth of his words, he would pay her forty-five shillings. F. POLLOCK & F. MAITLAND, *The History of English Law,* Vol. 2, pp. 536-38 (2d ed. 1968).

libel and slander actions, there was obviously no intention to tamper with these two well developed areas of the law. Accordingly, we must construe this statute in such a way that we harmonize it with the common law of defamation lest the expectations of the average person be utterly confounded. Obviously there are certain communications which are of the utmost urgency in a modern commercial society, but which by their very nature are insulting. If the communication of every element of bad news which has the least quality of personal disparagement is actionable, then we will create a society characterized by intense hypocrisy and a most refined sense of irony.

Since no reasonable society, even the one existing in courtly Virginia in 1810, could possibly have contemplated the degree of hypocrisy and irony which an expansive reading of our insulting words statute would invite, it is necessary to give the statute a reasonable construction. We conclude that the statute was intended to create a cause of action for two situations not otherwise actionable under common law defamation: first, for those insults of an un-privileged nature written or stated to the victim of the insult alone and thus not "published"; second, for insulting words which tend to violence and to a breach of the peace, which would include epithets and racial slurs. The first cause of action was never available under the common law of defamation, and the second was available only with proof of special damages. W. Prosser, *Law of Torts* §§ 112, 113 (4th ed. 1971).

One of the most difficult elements of this statute involves those instances where insulting words are uttered to the victim but not published to third parties. In many regards this is the most important element to be considered, since at common law there is no cause of action for insults which are not published. *Restatement (Second) of Torts* § 558(b) (1977). In order to invoke the aegis of this statute as a remedy for direct, unpublished insults, the words must be both insulting and tend to violence and a breach of the peace. *Poling v. Pickens*, 70 W.Va. 117, 73 S.E. 251 (1911).

Since insults of a vituperative nature were actionable at common law only when special damages were alleged, this

statute must have been intended to make these insults actionable even without such special proof. The statute in effect extended the common law concept of defamation *per se* to insulting words such as the vituperative epithet or racial slur.[3] However, the common law defenses of privilege and truth along with any First Amendment defenses are available in all actions brought under the insulting words statute, although it is difficult to conceive of a set of facts where either privilege or truth would be a defense to vituperative epithets or traditional racial slurs.

Especially difficult is the measure of damages for insults communicated to the victim alone. Here we follow the same reasoning which prompted courts to distinguish defamation *per se* from defamation *per quod*. A victim need not prove actual pecuniary damages for communications made to him alone which were either defamatory *per se* under common law or which would fall into the category of insults which tend to violence and a breach of the peace, including epithets and racial slurs. All other insulting words, namely those which do not tend to violence and breach of the peace, uttered to the victim alone are governed by the common law of libel and slander, which includes the requirement of publication.

Therefore, the two elements of (1) lack of a publication requirement, and (2) a cause of action for insulting words which tend to violence and a breach of the peace are the only differences between the law of the insulting words statute and common law defamation. In all *other* respects the substantive law of the statute is identical to that of common law defamation. The traditional insult involves an epithet or slur which falls into the category of "fighting words" and is frequently not uttered for the truth of the matter asserted. There are, however, other insults which are uttered for the truth of the matter asserted but which

---

[3] At common law, defamation *per se* includes only imputations of a crime of moral turpitude, imputations of a loathsome disease, imputations of sexual misconduct by a woman, and imputations which affect a business, trade, profession or office. *Restatement (Second) of Torts* §§ 571-74 (1977). This statute makes such insults as imputating canine ancestry or illegitimacy actionable *per se* as well.

a jury could find as well tend to violence and a breach of the peace. Such words would present an arguable case for relief under the statute, but all of the common law defenses in libel and slander are available in such a circumstance even when the case is pled under the statute.

## II

While the case before us does not involve a public figure plaintiff or First Amendment defenses, we are concerned that the statute also provides that "no demurrer shall preclude a jury from passing thereon." *W. Va. Code*, 55-7-2 [1923]. This provision must fail on federal constitutional grounds. Under *New York Times v. Sullivan*, 376 U.S. 254 (1969) whenever there is a First Amendment defense to actions under state law the state court is required to be a judge of both the facts and the law. *See Sprouse v. Clay Communications, Inc.*, 158 W.Va. 427, 211 S.E.2d 674 *Cert. denied*, 423 U.S. 882, *rehearing denied*, 423 U.S. 991 (1975). It is apparent, for example, that calling an ordinary person a "son of a bitch" is actionable, while referring to a politician in the same vituperative fashion is conceivably protected by the First Amendment.[4]

Furthermore, many of the doctrines of privilege developed at common law in libel and slander actions have been incorporated in the development of First Amendment law. Consequently, the development of an extensive body of federal law made applicable to state defamation actions through the First and Fourteenth Amendments after the enactment of our early statute requires us either to declare the statute unconstitutional under the *Constitution of the United States* or to apply our doctrine of the least intrusive remedy in order to assure that the statute will always be constitutionally applied. Rather than declaring the whole

---

[4] *Sullivan* severely restricts the situations in which public officials may recover for libel by a media defendant. Neither *Sullivan* nor its progeny clearly address the case of vituperative epithets uttered by private persons concerning public figures. However, it seems likely that, if a libelous statement in a national news magazine about a public figure is protected, then an epithet spoken in private to a public figure will be protected too. *Restatement (Second) of Torts* § 580A Comment (h) (1977).

statute unconstitutional, we shall follow the latter course to prohibit an unconstitutional application. *See State ex rel. Whitman v. Fox*, 160 W.Va. 633, 236 S.E.2d 565 (1977). Therefore we hold that the provision in *W. Va. Code*, 55-7-2 [1923] stating that "[n]o demurrer shall preclude a jury from passing thereon" is a nullity and will not be applied to future actions brought under this statute.[5]

### III

Let us now turn to examine the present case. The alleged insult was uttered for the truth of its contents alone; therefore, it does not fit into the category of epithets or racial slurs. However, although plaintiff could have brought her action under common law libel, we do not find that she failed to state a claim merely because the complaint pled a cause of action under the insulting words statute. This is consistent with West Virginia case law. *see Swearingen v. Parkersburg Sentinel Co.*, 125 W.Va. 731, 26 S.E.2d 209 (1943); *Barger v. Hood*, 87 W.Va. 78, 104 S.E. 280 (1920), and federal case law interpreting the statute. *See Porter v. Eyster*, 294 F.2d 613 (4th Cir. 1961); *Guthrie v. The Great American Insurance Company*, 151 F.2d 738 (4th Cir. 1945).

We find that the common law defense of qualified privilege is applicable in this case. A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter. *Swearingen v. Parkersburg Sentinel Co.*, 125 W.Va. 731, 744, 26 S.E.2d 209, 215 (1943). *See also, England v. Daily Gazette Co.*, 143 W.Va. 700, 104 S.E.2d 306 (1958). Dunworth's letter to Mauck clearly falls within the protection of a qualified privilege. As city manager, Dunworth was responsible for the hiring, supervision and dismissal of city employees. In writing his letter of dismissal to Mauck, he used words

---

[5] Demurrers to the evidence were abolished by Rule 50(2) of the *W. Va. Rules of Civil Procedure* and supplanted by motions for directed verdicts and judgments notwithstanding the verdict as provided for in Rule 50(a) and Rule 50(b) respectively.

directly from that part of the Martinsburg *Personnel Rules and Policies* which enumerate causes for dismissal, i.e., "inefficiency," "carelessness," and "negligence." The *Personnel Rules and Policies* also provide that a letter of dismissal should be submitted both to the employee and to the members of the city council. Once again Dunworth's actions in his capacity as city manager were well within the bounds of a qualified privilege.

A qualified privilege usually extends to employer-employee relations. In *Parker v. Appalachian Electric Power Co.*, 126 W.Va. 666, 30 S.E.2d 1 (1944) a letter from the plaintiff's former employer to an agent of the Division of Vocational Rehabilitation discussing why the employer would not rehire the plaintiff was found to be protected by a qualified privilege. In making that determination the Court focused on whether the communication dealt with facts "which affect a sufficiently important interest of the publisher" and whether "the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest." *Id.* at 672. Under this analysis Dunworth's letter was protected by the qualified privilege. The letter addressed only the question of Mauck's dismissal, an area of Dunworth's interest, and Dunworth sent the letter only to people who had a lawful interest in the dismissal, i.e., Mauck, the members of the city council, and the city attorney.

Given that Dunworth had a qualified privilege the next question is whether he abused that privilege. The test here is whether Dunworth limited "the publication to the parties to whom he owes a duty or to parties who may be concerned with him in the protection of a legitimate interest." *Porter v. Eyster*, 294 F.2d 613 at 618 (4th Cir. 1961). In *Eyster*, the Board of Stewards at the Charles Town Race Course posted a notice on a bulletin board at the racetrack to the effect that the plaintiff, a veterinarian, was ruled off the premises for violation of several track rules. The notice was also published in several racing publications and in Washington newspapers which circulate in Virginia and West Virginia. The court held that such publication did not constitute abuse of the privilege. By

comparison, Dunworth's publication of the letter to the members of the city council and the city attorney was well short of abuse through over-publication.

A person may also abuse a qualified privilege by acting out of malice. However, in this case there has been no evidence of malice on Dunworth's part. Therefore, we conclude that on the facts in the record, Dunworth's letter to the appellant was protected by a qualified privilege which he did not abuse.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Berkeley County granting judgment notwithstanding the verdict in favor of the appellees on the claim of insulting words and remanding the case for a new trial on the contract claim is affirmed.

*Affirmed.*