328 S.E.2d 675

**Betty J. MUTAFIS**

v.

**ERIE INSURANCE EXCHANGE, etc., and Erie Insurance Company, etc.**

**No. CC943.**

Supreme Court of Appeals of West Virginia.

March 28, 1985.

David J. Romano and James N. Riley, Young, Morgan, Cann & Romano, Clarksburg, for appellee.

James R. Watson, Steptoe & Johnson, Charleston, for defendant.

NEELY, Chief Justice:

During the summer of 1979 there were numerous thefts and arsons of cars in and around Clarksburg. On 27 May 1979, Betty J. Mutafis reported to her insurer, Erie Insurance Exchange, that her car had been stolen. Richard Kimble, an adjuster for Erie, investigated the claim; soon after the car was stolen, it was found stripped and burned. Erie then paid Mrs. Mutafis in accordance with her insurance policy.

Three weeks later Vincent Oliverio reported the theft of his car to Erie and Richard Kimble was also assigned to investigate that theft. There was significant delay in paying Mr. Oliverio for his loss. When Mr. Oliverio asked about the delay, Mr. Kimble told him that Erie was "investigating your involvement" with the reported theft. The Oliverio vehicle was then found stripped and burned and when Mr. Kimble could not substantiate any involvement in the theft by Mr. Oliverio, Erie paid the claim.

Mr. Oliverio, however, indignant over his treatment by Mr. Kimble, sued Erie on the grounds that Mr. Kimble had libeled and slandered him, uttered "insulting words" and engaged in improper conduct in handling his claim. During the course of the suit by Mr. Oliverio against Erie, Mr. Oliverio discovered a 7 August 1979 confidential memorandum prepared by Mr. Kimble's supervisor, Glenn W. LaQue. This memorandum came to light as a result of pre-trial discovery in the Oliverio case, and it was the following postscript to that memorandum that provided the gravamen of Betty Mutafis' claim against Erie:

> Please reference for *your* information to file # W017415, this is a relative and associated with mafia very heavily, although may have NO connection whatever.

Mr. Oliverio's counsel asked for claim file # W017415 and it turned out that the file related to Betty J. Mutafis' claim.

In March, 1981, during the trial of the Oliverio case, the 7 August memorandum was introduced into evidence, although counsel for Erie prevented disclosure of the name of Mr. Oliverio's relative. Nonetheless, despite the sealing of the court records, Mrs. Mutafis read a Clarksburg newspaper account of the trial and, being aware that she was an insured of Erie who was also a relative of Mr. Oliverio, deduced that the reference was to her. Then, after the Oliverio trial concluded, Mr. Oliverio told Mrs. Mutafis that the 7 August memorandum did, indeed, refer to her file.

Mrs. Mutafis consulted a lawyer and he wrote to Erie asking for an explanation of the unfavorable statements contained in his client's file. Two weeks later, having received no response or apology from Erie, Mrs. Mutafis filed suit in the United States District Court against Erie alleging five theories of liability: (1) intentional infliction of severe emotional distress; (2) libel and slander; (3) insulting words; (4) improper insurance claims handling; and, (5) breach of a fiduciary relationship between insurer and insured. The case was tried in the United States District Court for the Northern District of West Virginia where

the jury returned a verdict of $15,000 in compensatory damages and $20,000 in punitive damages in favor of Mrs. Mutafis and against Erie on the theory that Erie violated *W. Va. Code*, 33–11–4(3) or (5) [1974]—the West Virginia *Unfair Trade Practices Act.* Chief Judge Charles H. Haden II, of the District Court wrote a memorandum opinion and order, *Mutafis v. Erie Insurance Exchange*, 561 F.Supp. 192 (1983), and that opinion is reprinted here as appendix A to this opinion.

For reasons that will become apparent upon reading the District Court's opinion, the trial progressed in such a way that Mrs. Mutafis was allowed to go to the jury only on her theory of violation of the *Unfair Trade Practices Act*, although as Judge Haden indicates in his opinion, if her lawyers had proceeded in a different manner she might well have prevailed on her libel theory.

The district court decision was appealed to the United States Circuit Court of Appeals for the Fourth Circuit and by Order dated 2 July 1984 the Chief Judge of the United States Circuit Court certified three questions to this Court concerning the law of West Virginia, to wit:

1. If the facts stated in part I of this opinion are true, were the actions of Erie, its agents, servants, and employees in violation of § 33–11–4(3) and (5), or either of them?

2. If question 1 is answered in the affirmative, does West Virginia law permit a private cause of action by plaintiff against Erie?

3. If questions 1 and 2 are answered in the affirmative, is the common law defense of qualified privilege an available defense to the action?

The opinion of the United States Court of Appeals, 728 F.2d 672, to which the certified questions refer is, again, published here as Appendix B.

## I

Before answering the certified questions, it is important to point out that we must assume the findings of fact of the district court are correct. We are not sitting as an appellate court; rather, pursuant to *W. Va. Code*, 51–1A–1 [1976] we are simply asked to answer questions of law. In this regard, the cynosure of the District Court's opinion is found in § IV, *(The Jury's Verdict Was Supported by the Evidence)* where the District Judge says:

Erie's argument that the jury verdict was not supported by the evidence can be disposed of by an analysis of the testimony given by two employees of Erie. The two principals involved in preparing and drafting the August 7, 1979, memorandum were Richard Kimble, a claims adjuster who had worked on both the Oliverio and the Mutafis claims, and Wayne LaQue, an appraiser for Erie who was also Kimble's supervisor. Their sworn testimony at trial, standing alone, reveals ample evidence to support the jury's verdict for the Plaintiff.

Richard Kimble testified on direct examination (called by the Plaintiff as an adverse witness) that he did not write the August 7, 1979, memorandum, but that he did supply some of the information contained in it. Kimble stated that the memorandum itself was written by LaQue. The witness testified that he did *not* supply any information to LaQue linking the Plaintiff with the Mafia. Kimble said that he did not know where that information came from, and further testified that he did not have, nor did he have at the time of trial, *any* information to cause him to believe that the Plaintiff was associated with the Mafia.

Wayne LaQue (also called as an adverse witness by the Plaintiff) admitted writing the memorandum and stated that it was directed to a Mr. Chaffee, who was head of Erie's audit department, the division charged with investigating claims which appear "suspicious". At first, LaQue testified that all of the information in the memorandum, including the erroneous information concerning the Plaintiff's involvement in the Mafia, was supplied to him by Kimble. The witness later testified that he could not remember if Kimble had used those exact words, that is, that the Plaintiff was "heavily involved in the Mafia" and then

testified that he could not remember if Kimble had actually told him that the Plaintiff was in the Mafia.

LaQue further testified that the statement relating to the Plaintiff's alleged involvement in the Mafia was prompted by the "bad area" involved in the theft of Plaintiff's car. When questioned by the Court as to what he meant by "bad area" LaQue stated that it related to that area of Clarksburg where the car was found after it had been stripped and burned. A few minutes later, however, on redirect examination, the witness stated that "bad area" referred not to where the car was found, but to the section of Clarksburg in which the Plaintiff resided. Upon further questioning LaQue then admitted that he did not know where in Clarksburg the Plaintiff resided.

This testimony not only creates rather obvious credibility problems, but collectively, Kimble's and LaQue's testimony unequivocally demonstrate that the two employees responsible for the production of the memorandum, *by their own admission,* had no basis whatsoever for stating that the Plaintiff was connected in any way with the Mafia. As a result, there was sufficient evidence to support the jury's finding that Erie's employees placed in the Plaintiff's file information which they knew to be false. LaQue's and Kimble's testimony also support the jury's finding (via the award of punitive damages) that Erie's employees acted intentionally, recklessly and willfully in placing the memorandum in the Plaintiff's file.

## II

The first and the third certified questions, namely whether the defendant's actions are in violation of *W. Va. Code,* 33–11–4(3) and (5) [1974], and whether the common law defense of qualified privilege is available if there was a violation are related and we shall answer those two questions together.

*W. Va. Code,* 33–11–4(3) and (5) [1974], provide as follows:

(3) *Defamation.*—No person shall make, publish, disseminate, or circulate, directly or indirectly, or aid, abet or encourage the making, publishing, disseminating or circulating of any oral or written statement or any pamphlet, circular, article or literature which is false, or maliciously critical of or derogatory to the financial condition of any person and which is calculated to injure such person.

(5) *False statements and entries.*—

(a) No person shall knowingly file with any supervisory or other public official, or knowingly make, publish, disseminate, circulate or deliver to any person, or place before the public, or knowingly cause directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of a person.

(b) No person shall knowingly make any false entry of a material fact in any book, report or statement of any person or knowingly omit to make a true entry of any material fact pertaining to the business of such person in any book, report or statement of such person.

Subsection (3) of *W. Va. Code,* 33–11–4 [1974] prohibits the dissemination of false or maliciously critical statements. Certainly it is maliciously critical of and derogatory to a person's financial condition to assert that she is closely associated with the mafia. Similarly, Erie violated *W. Va. Code,* 33–11–4(5) [1974], which prohibits the insertion of false material about a person's financial condition in a private business file or publication of such material to the public. The mere publication of false material about a person's financial condition under *W. Va. Code,* 33–11–4(3) [1974] or the insertion of false material concerning the financial condition of a person into a company file under *W. Va. Code,* 33–11–4(5) [1974], however, does not give rise to a cause of action under *W. Va. Code,* 33–11–4(3) and (5) [1974], if any of the common law privileges that arose in the development of traditional libel and slander law applies, and it is to that subject that we now turn.

## III

We believe that the resolution of the privilege question in the case before us is controlled by our reasoning in the case of *Mauck v. City of Martinsburg*, 167 W.Va. 332, 280 S.E.2d 216 (1981). *Mauck* involved a similar question, namely whether the common law defenses of privilege, developed in the decisional law of libel and slander, apply to the statutory cause of action for insulting words, *W.Va.Code*, 55–7–2 [1923]. In syllabus point 3 of that case we set the policy that we hold applies to the case before us now:

> In an action for insulting words under *W.Va.Code*, 55–7–2 [1923], where the alleged words are uttered for the truth of the matter asserted there is a defense of qualified privilege completely coextensive with the defense of qualified privilege which existed heretofore in actions for defamation at common law; thus when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to persons who have a legitimate interest in the subject matter, the writing or speech is privileged.

█ Although *W.Va.Code*, 33–11–4(3) and (5) [1974] would appear to establish absolute liability whenever a false statement about the financial condition of a person is published generally or placed in a file, we do not believe that it was the intention of the legislature to so circumscribe necessary business communication as to establish absolute liability without fault. Furthermore, as we indicated in *Mauck*, a statute like *W.Va.Code*, 33–11–4(3) and (5) [1974] can raise serious First Amendment issues that are best handled by placing the statute within the well developed common law of libel and slander. The ancient body of well-developed defamation law establishes hierarchies of interests that are protected and accommodates both free speech on the one hand and victims' rights on the other. We do not, however, decide this case on First Amendment grounds; rather, we hold that the legislature had the law of defamation firmly in mind when it created the causes of action under *W.Va. Code*, 33–11–4(3) and (5) [1974] and intended they be interpreted with the common law defamation privileges as necessary qualifications to the statutes.

█ However, inasmuch as Mr. LaQue testified in the district court that his statement about Mrs. Mutafis' connection with the Mafia was prompted by the "bad area" involved in the theft of the plaintiff's car, and then that the "bad area" related not to the area of the theft, but rather to the area where Mrs. Mutafis lived, and then that he did not know where Mrs. Mutafis lived, we conclude that the memorandum in question was written with such willful, wanton, and reckless disregard of its truth or falsity that no recognized privilege under West Virginia law applies to it. *Sprouse v. Clay Communications, Inc.*, 158 W.Va. 427, 211 S.E.2d 674 (1975), *cert. denied*, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975); *reh'g denied*, 423 U.S. 991, 96 S.Ct. 406, 46 L.Ed.2d 311 (1975). In fact, Mr. LaQue's testimony unequivocally demonstrates that the two employees responsible for the production of the memorandum, *by their own admission*, had no basis whatsoever for stating that the plaintiff was connected in any way with the Mafia. As a result, there was sufficient evidence to support the jury's finding that Erie's employees placed in the plaintiff's file information that they knew to be false. There is, of course, no privilege known to the common law of defamation protecting the intentional publication of false material.

## IV

Finally, we must address the federal circuit court's second certified question, namely whether a private cause of action exists to enforce the *Unfair Trade Practices Act*. In Syllabus Point 1 of *Hurley v. Allied Chemical Corp.*, 164 W.Va. 268, 262 S.E.2d 757 (1980) we set forth the guidelines for determining whether violation of a statute gives rise to a private cause of action. That syllabus point provides:

> The following is the appropriate test to determine when a State statute gives rise by implication to a private cause of ac-

tion: (1) the plaintiff must be a member of the class for whose benefit the statute was enacted; (2) consideration must be given to legislative intent, express or implied, to determine whether a private cause of action was intended; (3) an analysis must be made of whether a private cause of action is consistent with the underlying purposes of the legislative scheme; and (4) such private cause of action must not intrude into an area delegated exclusively to the federal government.

In *Jenkins v. J.C. Penney Casualty Ins. Co.*, 167 W.Va. 597, 280 S.E.2d 252 (1981) we already held in Syllabus Point 2 that there is an implied private cause of action for a violation by an insurance company of subsection (9) of *W.Va.Code*, 33-11-4 [1974]. Certainly there is no less reason to allow a private cause of action under subsections (3) and (5) of *W.Va.Code*, 33-11-4 [1974] than there is under subsection (9) of the same statute.

■ The test of *Hurley* is met in the case before us because Mrs. Mutafis was a member of the class of persons whose financial reputation was sought to be protected by the statute; the legislature obviously intended that the statute have some meaning, and it is hard to conceive how it would be enforced in the absence of a private cause of action; there is no reason to believe that a private cause of action is in any regard inconsistent with the underlying purposes of the legislative scheme; and, the federal government has nothing whatsoever to do with this area of state law. There is no reason here to repeat the exhaustive reasoning and citations to authority in our opinion in *Jenkins,* and therefore, we answer the Federal Court's second question affirmatively and hold that there

is a private cause of action for a violation of *W.Va.Code*, 33-11-4(3) and (5) [1974].

Certified questions answered.