**Betty J. MUTAFIS, Plaintiff,**

v.

**ERIE INSURANCE EXCHANGE, et al., Defendants.**

**Civ. A. No. 81–0044–C(H).**

United States District Court,
N.D. West Virginia,
Clarksburg Division.

**March 25, 1983.**

---

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

### I. *Background*

The Plaintiff, Betty J. Mutafis, a former policyholder of the Erie Insurance Exchange (Erie), brought this action [1] against the Defendant corporations alleging intentional infliction of emotional distress, libel, slander and breaches of the West Virginia Insulting Words Statute [2] and Unfair Trade

---

1. This Court has diversity jurisdiction under the provisions of 28 U.S.C. § 1332. The Plaintiff is a resident of West Virginia; the Defendants are Pennsylvania corporations. The complaint asserted a colorable claim for an amount in excess of $10,000.

2. *W.Va.Code*, § 55–7–2, discussed *infra* at page 197, note 7.

Practices Act.[3] The conduct complained of occurred during Erie's investigation of the insurance claims filed by the Plaintiff and her cousin, Vincent J. Oliverio, both of whom had had a car stolen in 1979. Both cars were later found "stripped" of valuable accessories and burned. During the course of this investigation, one of Erie's appraisers inserted in Plaintiff's file and cross-referenced to Oliverio's file, a memorandum stating that the Plaintiff was "heavily involved in the Mafia"[4]. At the conclusion of the two-day trial the jury returned a verdict for the Plaintiff on the Unfair Trade Practices Act count and awarded compensatory damages of $15,000 and punitive damages of $20,000. The case is presently before the Court on Erie's motions for a new trial, for judgment notwithstanding the verdict, and for a remittitur.

In support of its motions Erie challenges the jury verdict on the following grounds: (1) Erie's memorandum was protected under the First Amendment; (2) no private cause of action exists under *W.Va.Code*, § 33–11–4(3) or (5); (3) there was insufficient evidence to support the jury verdict; (4) the Plaintiff suffered no actual damages; (5) the jury's award of punitive damages was improper; (6) the Plaintiff did not prove that the Defendants' conduct constituted a "general business practice"; and (7) the Unfair Trade Practices Act was applied retroactively. The Court will address these arguments *in seriatum*.

II. *Erie's Memorandum Was Not Protected By The First Amendment*

Erie argues that the Supreme Court has recognized that commercial speech is entitled to First Amendment protection and that, therefore, the memorandum at issue in this action must be scrutinized in accord with constitutional standards protecting freedom of speech. Specifically, the Defendant contends that the standards set forth in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)

apply and that any recovery by the Plaintiff should have been predicated upon a finding by the jury that the Defendant acted "maliciously" and that the Plaintiff suffered actual damages. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (requirement of malice); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 325, 94 S.Ct. 2997, 3000, 41 L.Ed.2d 789 (1974) (requirement of actual damages). In support of this argument Erie states that there was no issue of malice to present to the jury because the Court found as a matter of law, by granting the Defendant's motion for a directed verdict as to the Plaintiff's libel and slander causes of action, that Erie had not acted maliciously.

While the Supreme Court's decision in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) does extend First Amendment protection to certain types of commercial speech, the remainder of Erie's argument does not survive scrutiny for several reasons. First, the Defendant's entire argument has as its cornerstone the contention that the Court concluded as a matter of law that Erie's employees had not acted maliciously. As the following discussion explains, the Court made no such ruling concerning the absence of a malicious motivation on behalf of Erie.

The Court did remove from the jury's consideration, on Erie's motion for a directed verdict, the Plaintiff's libel and slander causes of action. Because the communication remained entirely intra-corporate, the Court concluded as a matter of law that there had been no publication of the memorandum and that lacking this essential element the Plaintiff could not proceed on her libel and slander theories. *See Mauck v. City of Martinsburg,* 280 S.E.2d 216 (W.Va. 1981). As a second reason for granting Erie's motion for a directed verdict on these

---

3. *W.Va.Code,* § 33–11–1, *et seq.,* discussed *infra* at Section III.

4. The Court notes at the outset of this discussion that the falsity of this statement has never

been questioned by Erie. The facts surrounding the placement of this memorandum into the Plaintiff's insurance file is more fully discussed *infra* at Section IV.

counts, the Court held· that even if there was a publication of the memorandum, there attached to that communication a qualified ·privilege. Because there was no controversy concerning the circulation of the memorandum the Court ruled as a matter of law [5] that, inasmuch as the memorandum had been "published" only to those employees of the company who had a legitimate interest in the contents of the document, the qualified privilege had not been abused or exceeded.[6]

**5.** In *Parker v. Appalachian Electric Power Company,* 126 W.Va. 666, 30 S.E.2d 1 (1944) the West Virginia Supreme Court of Appeals held that, "[w]hether a conditionally privileged occasion was exceeded is a question of law for the court or fact for the jury and depends upon the absence or existence of a controversy as to facts bearing thereon." *Id.* at 672; 30 S.E.2d at 4. This standard was also cited in *England v. Daily Gazette Company,* 143 W.Va. 700, 104 S.E.2d 306 (1958); *City of Mullens v. Davidson,* 133 W.Va. 557, 57 S.E.2d 1 (1949); *Swearingen v. Parkersburg Sentinel Company,* 125 W.Va. 731, 26 S.E.2d 209 (1943); *Stewart v. Riley,* 114 W.Va. 578, 172 S.E. 791 (1934); *Higgins v. Williams Pocohontas Coal Company,* 103 W.Va. 504, 138 S.E. 112 (1927).

**6.** Communications between an employer and his employees usually fall within the conditional privilege. *Mauck,* 280 S.E.2d at 221, *citing Parker v. Appalachian Electric Power Company, supra.* "The qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter." *Mauck,* 280 S.E.2d at 221.

To determine whether one has exceeded the qualified privilege the Court must look to whether the publisher limited "the publication to the parties to whom he owes a duty or to parties who may be concerned with him in the protection of a legitimate interest." *Porter v. Eyster,* 294 F.2d 613 (4th Cir.1961) *citing Barger v. Hood,* 87 W.Va. 78, 104 S.E. 280 (1920); *Rigney v. W.R. Kreese & Co.,* 104 W.Va. 168, 139 S.E. 650 (1927); *Stewart v. Riley,* 114 W.Va. 578, 172 S.E. 791 (1934); *Swearingen v. Parkersburg Sentinel Company,* 125 W.Va. 731, 26 S.E.2d 209 (1943); *England v. Daily Gazette Company,* 143 W.Va. 700, 104 S.E.2d 306 (1958). *See also Mauck v. City of Martinsburg,* 280 S.E.2d at 221 (quoting the same language from the Fourth Circuit's opinion in *Porter* ).

The testimony presented at trial was bereft of any indication that the memorandum was published to anyone not having a legitimate interest in the information contained therein. The only extra-corporate publication was made

From this ruling the Defendant infers a *sub silentio* finding by the Court that the employees of Erie had not acted maliciously. This inference is grounded on the principle that a qualified privilege can be abused by a person acting out of malice, as well as by over-publication. The Court acknowledges this as a correct statement of West Virginia law. *Mauck v. City of Martinsburg,* 167 W.Va. 332, 280 S.E.2d 216, 221 (1981). The infirmity of Erie's analysis lies in the fact that though the Court did specifically rule that a qualified privilege was ap-

pursuant to discovery proceedings in the case of *Vincent Oliverio v. Erie Insurance Exchange,* Civil Action No. 79–C–856–2, which was pending in the Circuit Court of Harrison County. That action was based on false statements made by employees of Erie Insurance Exchange linking Oliverio with the Mafia. Oliverio's counsel, the same counsel representing the Plaintiff at bar, obtained through the appropriate provisions of the West Virginia Rules of Civil Procedure, a copy of Oliverio's claim file. That file contained a reference to an unnamed relative of Oliverio's identified only by claim number, who was allegedly "heavily involved in the Mafia". Oliverio's counsel, again through the use of the Rules of Civil Procedure, obtained the relative's file, which subsequent developments revealed to be that of the Plaintiff.

During the course of the Oliverio trial the Clarksburg papers carried stories on the proceedings, including the following report which appeared in the morning edition of the local newspaper, The Clarksburg Exponent, on Saturday, March 28, 1981:

"After the suit was filed and the records were released, Oliverio and his attorney, David Romano, found a paper there indicating that one of his relatives, whose name was not revealed, was heavily associated with the Mafia."

[An identical news account of the *Oliverio* trial was carried in the evening edition of the local paper, The Clarksburg Telegram.] After his trial had concluded, Oliverio discussed the trial and the newspaper accounts with the Plaintiff and confirmed her suspicion that it was her file which was referred to in the news accounts.

Even though the release of the file to Oliverio's counsel constituted an extra-corporate publication, the Court ruled that this could not be considered an abuse of the qualified privilege because this communication was incident to a judicial proceeding and was, therefore, absolutely privileged. *See Parker v. Appalachian Electric Power Co.,* 126 W.Va. 666, 30 S.E.2d 1 (1934); *Higgins v. Williams Pocohontas Coal Co.,* 103 W.Va. 504, 138 S.E. 112 (1927); *Ward v. Ward,* 47 W.Va. 766, 35 S.E. 873 (1900).

plicable and also specifically ruled that it had not been abused by *over-publication*, the Court did *not* rule that the privilege was not abused by *malice*.

■ If the Court had simply made a general ruling, without explanation, that the conditional privilege had not been exceeded, then an argument could be made that such a ruling logically and necessarily implies two things: (1) the privilege was not abused by over-publication; and (2) the publisher did not act with malice. However, as noted above, the Court ruled only on the question of whether the memorandum was published to anyone not having a legitimate interest in it. The issue of whether Erie's employees acted with malice and thereby violated the conditional privilege was not mentioned or presented by either counsel during the arguments on the Defendant's motion for a directed verdict. Therefore, the issue of malicious motivation was not before the Court, was not considered by the Court, and accordingly, was not ruled upon by the Court in granting the Defendant's motion for a directed verdict on the Plaintiff's libel and slander causes of action. Because implicit in Erie's analysis is the contention that there was an alternate theory the Court could have relied upon to *deny* Erie's motion for a directed verdict on the Plaintiff's libel and slander causes of action (i.e., malicious motivation), Erie's contention here is, at best, an argument that the Court erred *in favor of Erie* in withdrawing the libel and slander counts from the jury's consideration.[7]

■ Secondly, Erie's contention that the memorandum involved here constitutes "commercial speech" protected by the First Amendment and that such communication may not serve as a basis for a defamation-type action unless the *New York Times v. Sullivan* standard is met finds no support in the case law or the facts of this case.

*First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *Virginia Board of Pharmacy v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1970), the cases cited by the Defendant in support of the argument that the First Amendment standards apply, are inapposite. Those cases involve state statutes restricting a commercial entity's ability to disseminate information to the *public.*[8]

---

7. At the conclusion of all the evidence the Court also granted Erie's motion for a directed verdict on the Plaintiff's cause of action under the Insulting Words Statute, *W.Va.Code,* § 55-7-2. Because the Court had ruled that there was no publication to a third party, any recovery by the Plaintiff under the insulting words statute would have to have arisen from a communication of the insulting statement to the victim of the insult, the Plaintiff, alone. *Mauck v. City of Martinsburg,* 280 S.E.2d 216, 218 (W.Va.1981). As the evidence presented at trial and the deposition testimony of the Plaintiff reproduced below indicates, the insult was never directly communicated to the Plaintiff:

"Q. Have you ever seen such a document or memo [referring to the August 7, 1979, memorandum]?
A. No, I haven't.
Q. Prior to the newspaper account, had you ever received any information that indicated to you that there existed anything in your insurance records with Erie that used your name in connection with the Mafia?
A. No.
Q. Would it be a fair statement to say that by reason of the newspaper account, you had suspicions that you were the cousin to which reference was made?
A. Yes.
Q. And then Mr. Oliverio confirmed those suspicions when had his conversation with you after his trial?
A. Yes."

The lack of a direct communication of the offensive statement to the Plaintiff or to a third party prevented the Plaintiff from establishing a viable cause of action under the Insulting Words Statute. Therefore, the Court dismissed this count of the complaint.

8. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) involved a Massachusetts statute prohibiting corporations from making expenditures or contributions "for the purpose of ... influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation." *Id.* at 768, 98 S.Ct. at 1411. The statute also contained a provision absolute-

Because there is absolutely no indication in any of these cases that constitutional standards of free speech would extend so far as to embrace entirely intra-corporate communications such as the one giving rise to this action, the Court must reject Erie's contention that the August 7, 1979, memorandum is protected under the First Amendment.

The final reason for rejecting Erie's argument on this point is that, assuming for the sake of argument that constitutional standards were applicable here, the standard by which Erie's conduct was measured *did* meet the First Amendment standards the Defendant urges the Court to adopt. As noted above, Erie would have the Court apply the standard of liability set forth in *New York Times v. Sullivan,* which requires liability to be predicated upon a finding that the Defendant acted with "actual malice". The Supreme Court defined the "actual malice" necessary to make a statement actionable as one made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 725–26.[9] At the trial of this action the jury was instructed that liability was dependent upon a finding that the Defendant *knowingly* made a false material statement concerning the Plaintiff. Thus, the *Sullivan* standard that the statement be made with "knowledge that it was false" was incorporated in the Court's charge to the jury. The jury's verdict for

---

ly barring corporate expenditures on ballot issues relating solely to individual taxation. *Id.* The Court found the statute to be "an impermissible legislative prohibition of speech based on the identity of the interest that spokesmen may represent in *public debate* over controversial issues and the requirement that the speaker have a sufficiently great interest in the subject to justify communication." 435 U.S. at 784, 98 S.Ct. at 1420 (emphasis added).

In *Virginia Board of Pharmacy v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) the Court considered the constitutionality of a Virginia statute which provided that a pharmacist is guilty of unprofessional conduct if he advertises the price of prescription drugs. *Id.* at 749–50, 96 S.Ct. at 1819–20. In striking down the statute using a First Amendment analysis the Court stated that: "[i]t is a matter of *public interest* that those decisions, [concerning the proper allocation of resources in a free enterprise economy] in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable." *Id.* at 765, 96 S.Ct. at 1827 (emphasis added).

Another Virginia statute was at issue in *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). Bigelow, an editor of a newspaper, was tried and convicted of violating a Virginia statute making it a misdemeanor for any person to encourage or prompt, by the sale or circulation of any publication, the procuring of an abortion. *Id.* at 812–13, 95 S.Ct. at 2227–28. The newspaper of which Bigelow was the managing editor ran an advertisement informing readers of the availability of legal abortions in New York. The advertisement also contained the address and telephone number of an agency which would assist interested persons in making the necessary arrangements. 421 U.S. at 812, 95 S.Ct. at 2227. The Court reversed Bigelow's conviction after concluding that the advertisement was protected speech under the First Amendment. Viewing the advertisement in its entirety the Court found that it "conveyed information of a potential interest and value to a diverse audience—not only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter or the law of another State and its development, and to readers seeking reform in Virginia." 421 U.S. at 822, 95 S.Ct. at 2232.

The last case cited by Erie is *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). There the Supreme Court addressed a regulation of the Supreme Court of Arizona which restricted advertising by attorneys. Perceiving that the advertising ban, like the Virginia statute challenged in *Virginia Board of Pharmacy,* served "to inhibit the free flow of commercial information *and to keep the public in ignorance*", the Court held the disciplinary rule to be violative of the First Amendment. *Id.* at 384, 97 S.Ct. at 2709 (emphasis added).

9. In addition to the factors previously discussed in the text which distinguish the First Amendment cases relied upon by Erie, in discussing *New York Times v. Sullivan,* this Court is constrained to further point out that *Sullivan* involved two important elements not present in this case—a media defendant and a plaintiff who was a public official. This distinction is noteworthy since the Supreme Court wished to avoid "self-censorship" by the press and considered the issues in *Sullivan* "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. at 270, 84 S.Ct. at 720.

the Plaintiff. indicates a finding by that body that Erie made a knowingly false statement in placing the memorandum in Plaintiff's file. Therefore, the Defendant's conduct was measured by a standard sufficient to establish liability even if the communication was protected commercial speech under the First Amendment.

For the reasons just discussed, the Court rejects Erie's argument that the Plaintiff's recovery in this action violated the First Amendment's guarantee of Freedom of Speech.

### III. A Private Cause Of Action Exists Under W.Va.Code, § 33–11–4(3) and (5)

While Erie concedes, as it must, that the West Virginia Supreme Court in *Jenkins v. J.C. Penney Casualty Insurance Company,* 280 S.E.2d 252 (W.Va.1981) recognized that a violation of *W.Va.Code,* § 33–11–4(9) gives rise to a private cause of action, the Defendant contends that no such cause of action exists under *W.Va.Code,* § 33–11–4(3) or (5), the subsections on which the Plaintiff's verdict was based. These subsections provide:

"(3) No person shall make, publish, disseminate, or circulate, directly or indirectly, or aid, abet, or encourage the making, publishing, disseminating or circulating of any oral or written statement or any pamphlet, circular, article or literature which is false, or maliciously critical of or derogatory to the financial condition of any person and which is calculated to injure such person.

(5)(a) No person shall knowingly file with any supervisory or other public official, or knowingly make, publish, disseminate, circulate or deliver to any person, or place before the public, or knowingly cause di-

rectly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of a person.

(b) No person shall knowingly make any false entry of a material fact in any book, report or statement of any person or knowingly omit to make a true entry of any material fact pertaining to the business of such person in any book, report or statement of such person."

Before turning to the relevant factors to be considered in determining whether subsections 4(3) and 4(5) support private actions for redress, the Court deems it beneficial to point out that the West Virginia Supreme Court of Appeals has noted its predisposition to recognize implied causes of action. The court stated in *Jenkins,* "This Court's past acceptance of an implied cause of action for a statutory violation is deeply engrained." 280 S.E.2d at 255. The court went on to point out that West Virginia is perhaps the only jurisdiction to allow a private tort action for violation of a statute requiring sidewalks to be kept in good repair. *Id.* Therefore, in attempting to determine whether the West Virginia courts would permit a private cause of action under subsections 4(3) and 4(5) [10] this Court will do so with a recognition that the West Virginia Supreme Court has demonstrated a willingness to allow statutorily implied causes of action.

The controlling authority in West Virginia on the recognition of implied causes of action is *Hurley v. Allied Chemical Corporation,* 164 W.Va. 268, 262 S.E.2d 757 (1980). *Hurley* set forth four factors for courts to consider in making the determination of whether a violation of a statute gives rise to a private action.[11] Because the court in

---

10. In making determinations of state law in diversity cases under the doctrine of *Erie Railway Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) where there is no controlling state precedent, a federal court must look to the probable analysis the forum state's highest court would employ. *Patrick v. Sharon Steel Corporation,* 549 F.Supp. 1259

(N.D.W.Va.1982); *Pauley v. Combustion Engineering, Inc.,* 528 F.Supp. 759 (S.D.W.Va.1981).

11. Syllabus point 1 of the *Hurley* opinion summarized the analysis to be used.

"The following is the appropriate test to determine when a State statute gives rise by implication to a private cause of action: (1) the plaintiff must be a member of the class

*Jenkins* analyzed the same statute, albeit a different subsection, as the one involved here, this Court will review the *Hurley* factors by retracing the analytic steps taken by the Court in *Jenkins*.

The first factor to be considered is whether the Plaintiff is a member of the class for whose protection the statute was enacted. The Court will not tarry upon a point that is so obvious as to be beyond serious dispute: an insured, such as the Plaintiff, is most certainly a person within the class intended to be protected by a statute regulating trade practices in the insurance industry. This elementary point is implicit throughout the West Virginia Supreme Court's opinion in *Jenkins*.[12]

*Hurley* next requires the Court "to determine whether from the act itself or from its legislative history a private cause of action was intended." 280 S.E.2d at 257. Because this factor focuses upon the Act itself rather than on any particular section, the discussion of this factor in *Jenkins* is dispositive. In *Jenkins* the court determined that, "[w]hile there is no legislative history, the strong policy declaration in our statute against unfair insurance practices initially suggest the appropriateness of a private cause of action." 280 S.E.2d at 257. The court went on to discuss, and finally rejected, the proposition that that section of the Act which provides an administrative remedy may be contra-indicative of a private cause of action.[13] This Court shares the view expressed in *Jenkins* that the Act's strong policy statement militates in favor of recognizing a private cause of action under the statute.

When considering the third factor set forth in *Hurley*, whether a private cause of action is consistent with the underlying purpose of the legislative act, the court in *Jenkins* considered the particular subsection of the Unfair Trade Practices Act, upon which Jenkins relied. In discussing the unfair settlement practices subsection of the Act, the court held that allowing a private cause of action under that subsection was consistent with the underlying legislative purpose and that permitting a person to recover damages resulting from a violation of that subsection would act as a deterrent against further violations of the Act. 280 S.E.2d at 258. Those statements are equally applicable to the subsections involved here, each of which makes it unlawful for an insurance company to knowingly place false information in an insured's file. Allowing a person to recover damages in a private action for injuries resulting from a violation of subsections 4(3) and 4(5) is perfectly consistent with a legislative scheme designed to prevent an insurance company from knowingly making false statements about its insureds. The potential for liability and tort created by recognizing a private cause of action under these subsections would likewise achieve the deterrent effect spoken of by the court in *Jenkins* and would thus be an effective tool in securing compliance with the Act.

The last factor to be considered is whether the State statute-based cause of action will intrude into an area exclusively delegated to the federal government. As noted by the Court in *Jenkins*, there is no potential conflict with federal law in this area since the Congress has specifically relegated the regulation of insurance to the states.[14]

for whose benefit the statute was enacted; (2) consideration must be given to legislative intent, express or implied, to determine whether a private cause of action was intended; (3) an analysis must be made of whether a private cause of action is consistent with the underlying purposes of the legislative scheme; and (4) such private cause of action must not intrude into an area delegated exclusively to the federal government."

12. *See e.g.* the court's statement that ["t]here can be little question in reviewing the entire Act that it is not limited to activities between

the insured and the insurance company. 280 S.E.2d at 255.

13. This section, *W.Va.Code,* § 33–11–6, is discussed in Section VI of this opinion. *See* footnote 18 and accompanying text.

14. *See* 15 U.S.C. § 1011, which provides:
   "The Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to im-

In view of the fact that the West Virginia Supreme Court of Appeals has already recognized a private cause of action under one of the subsections of the Unfair Trade Practices Act and inasmuch as each of the above discussed *Hurley* factors argue in favor of allowing a private cause of action under the subsections relied upon in this action, the Court concludes that private causes of action exist under *W.Va.Code,* § 33–11–4(3) and (5). Accordingly, the Court committed no error at trial in allowing the Plaintiff to proceed, and recover, on these theories.

## IV. *The Jury's Verdict Was Supported By The Evidence*

Erie's argument that the jury verdict was not supported by the evidence can be disposed of by an analysis of the testimony given by two employees of Erie. The two principals involved in preparing and drafting the August 7, 1979, memorandum were Richard Kimble, a claims adjuster who had worked on both the Oliverio and the Mutafis claims, and Wayne LaQue, an appraiser for Erie who was also Kimble's supervisor. Their sworn testimony at trial, standing alone, reveals ample evidence to support the jury's verdict for the Plaintiff.

Richard Kimble testified on direct examination (called by the Plaintiff as an adverse witness) that he did not write the August 7, 1979, memorandum, but that he did supply some of the information contained in it. Kimble stated that the memorandum itself was written by LaQue. The witness testified that he did *not* supply any information to LaQue linking the Plaintiff with the Mafia. Kimble said that he did not know where that information came from, and further testified that he did not have, nor did he have at the time of trial, *any* information to cause him to believe that the Plaintiff was associated with the Mafia.

Wayne LaQue (also called as an adverse witness by the Plaintiff) admitted writing the memorandum and stated that it was directed to a Mr. Chaffee, who was head of Erie's audit department, the division charged with investigating claims which appear "suspicious". At first, LaQue testified that all of the information in the memorandum, including the erroneous information concerning the Plaintiff's involvement in the Mafia, was supplied to him by Kimble. The witness later testified that he could not remember if Kimble had used those exact words, that is, that the Plaintiff was "heavily involved in the Mafia" and then testified that he could not remember if Kimble had actually told him that the Plaintiff was in the Mafia.

LaQue further testified that the statement relating to the Plaintiff's alleged involvement in the Mafia was prompted by the "bad area" involved in the theft of Plaintiff's car. When questioned by the Court as to what he meant by "bad area" LaQue stated that it related to that area of Clarksburg where the car was found after it had been stripped and burned. A few minutes later, however, on redirect examination, the witness stated that "bad area" referred not to where the car was found, but to the section of Clarksburg in which the Plaintiff resided. Upon further questioning LaQue then admitted that he did not know where in Clarksburg the Plaintiff resided.

This testimony not only creates rather obvious credibility problems, but collectively, Kimble's and LaQue's testimony unequivocally demonstrate that the two employees responsible for the production of the memorandum, *by their own admission,* had no basis whatsoever for stating that the Plaintiff was connected in any way with the Mafia. As a result, there was sufficient evidence to support the jury's finding that Erie's employees placed in the Plaintiff's file information which they knew to be false. LaQue's and Kimble's testimony also support the jury's finding (via the award of punitive damages) that Erie's employees acted intentionally, recklessly and willfully in placing the memorandum in the Plain-

---

pose any barrier to the regulation or taxation of such business by the several states."

*See also W.Va.Code,* § 33–11–1.

tiff's file.[15] Indeed, the testimony adduced at trial and summarized above compels such a finding; the evidence commends no other inference save the one drawn by the jury. The jury's verdict being entirely consistent with the evidence presented at trial, the Defendant's motion to set aside the jury verdict on the grounds that it is unsupported by the evidence is devoid of merit.[16] *Accord, Cicinato v. McPheeters,* 542 F.2d 634 (4th Cir.1976); *Harner v. McShain, Inc.,* 394 F.2d 480 (4th Cir.1968); *Mays v. Pioneer Lumber Corporation,* 502 F.2d 106 (4th Cir.1974).

In a different vein Erie argues that the jury verdict was unsupported by the evidence inasmuch as subsections 4(3) and 4(5)(a) speak only of false statements which are derogatory to the "financial condition" of a person and subsection 4(5)(b) relates only to false statements concerning the "business" of such person. The Defendant argues that the only false statement involved here, that the Plaintiff was heavily involved in the Mafia, could not be interpreted to relate to the Plaintiff's "financial condition" or "business" and, therefore, the August 7, 1979, memorandum could not be actionable under *W.Va.Code,* § 33–11–4(3), (5)(a) or (5)(b).

Perhaps the most effective and concise response to this argument that the memorandum could not be interpreted in such a fashion would be simply "but the jury found otherwise". The jury was properly instructed on the elements of the statute, including the provisions requiring that the statement be made in reference to the Plaintiff's financial condition or business. It was within the province of the jury to determine what inferences could be reasonably drawn from the statement contained in the memorandum that the Plaintiff was "heavily involved in the Mafia." The jury's verdict obviously reflects that body's considered judgment that the language used in the memorandum impugned the Plaintiff's financial condition and business. The Court cannot say as a matter of law that this construction is invalid or is not supported by the evidence. *See Cicinato v. McPheeters, supra; Harner v. McShain, Inc., supra; Mays v. Pioneer Lumber Corporation, supra.* The jury could properly consider all the implicit ramifications contained in a statement linking an individual with such an infamous criminal organization. The jury could well have found that the memorandum was perjorative not only of the Plaintiff's financial condition and business, but to her moral, social and ethical integrity as well. Subsection 4(3) and 4(5) must be read to embrace a cause of action not only for those false statements made in direct and specific reference to an insured's financial condition or business, but also those false statements which a jury may infer necessarily relate to the insured's commercial enterprise or financial status. Any other construction of the statute would permit insurance companies to easily avoid liability under the Act simply by couching their derogatory remarks in ambiguous phrases which nevertheless convey the same meaning, and cause the same injury, as statements specifically referring to the insured's business or financial condition. The Court concludes that the jury's finding that the memorandum impeached the Plaintiff's financial condition and business is supported by the evidence, the memorandum

---

15. The jury was instructed that:

"In order to recover punitive damages, the Plaintiff must prove by a preponderance of the evidence that the Defendant acted in an intentional manner, meaning an intent to harm someone, or with a recklessness demonstrating disregard for another person's rights and the Defendant must also have acted willfully."

This was a correct statement of West Virginia law. *See Wells v. Smith,* 171 W.Va. 97, 297 S.E.2d 872 (1982); *Bond v. City of Huntington,* 276 S.E.2d 539 (W.Va.1981).

16. When ruling on a motion for judgment notwithstanding the verdict, the only issue for the Court to decide is whether, giving the non-moving party the benefit of every legitimate inference, there was evidence upon which the jury could reasonably return a verdict for the prevailing party. *Mays v. Pioneer Lumber Corporation,* 502 F.2d 106 (4th Cir.1974).

itself, and the inferences which the jury could reasonably draw therefrom.

### V. *The Plaintiff Suffered Actual Damages*

It is also apparent that Erie's argument that the Plaintiff suffered no actual damages lacks merit. Recovery for emotional distress unaccompanied by physical injury is proper in cases involving an intentional tort. *Harless v. First National Bank of Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982); *Sprouse v. Clay Communications,* 211 S.E.2d 674 (W.Va.1975); *Prince v. The Pittston Co.,* 63 F.R.D. 28 (S.D.W.Va.1974); *Monteleone Co. v. Co-Operative Transit Company,* 128 W.Va. 340, 36 S.E.2d 475 (1945).[17] The Plaintiff's uncontradicted testimony established the anguish, embarrassment, shame, anger and depression which she suffered as a result of Erie's conduct. The evaluation of Plaintiff's emotional distress was a quintessential jury issue. The jury's award of $15,000 compensatory damages for Plaintiff's injuries certainly was not "monstrous and enormous, at first blush beyond all measure, unreasonable and outrageous, and such as manifestly shows jury passion, partiality, prejudice, or corruption", *Addair v. Magestic Petroleum Co., Inc.,* 232 S.E.2d 821, 825 (W.Va.1977), and therefore, must remain undisturbed.

### VI. *The Jury's Award Of Punitive Damages Was Proper*

Erie challenges the award of punitive damages because of the "constitutional ramifications involving an award of punitive damages in an area affecting protected commercial speech." This argument is mooted by the Court's conclusion, already explained, that the memorandum in question was not protected speech under the First Amendment.

Erie also argues that no punitive damages should be allowed in actions under the Unfair Trade Practices Act because Section 33–11–6 [18] permits the Commissioner of Insurance to impose sanctions and, therefore, there is no need for punitive damages in order to discourage violations of the Act.

This argument ignores Section 6(c) which clearly states that: "[n]o order of the commissioner pursuant to this article or order of court to enforce it, or holding of a hearing, *shall in any manner relieve or absolve any person affected by such order or hearing from any other liability, penalty or forfeiture under law.*" (Emphasis added). In view of such an unambiguous legislative pronouncement, there can be no serious contention that the provisions of Section 33–11–6 bar a recovery of punitive damages by a private plaintiff. Moreover, in discussing the damages recoverable in an action seeking redress for a violation of Section 33–11–4(9) the court in *Jenkins* stated that punitive damages may be recovered in an appropriate action. 280 S.E.2d at 259, n. 12. Inasmuch as subsection 4(9) and the subsections involved here are indistinguishable for purposes of the present discussion, the

---

17. The court in *Harless* borrowed the definition of "emotional distress" found in Section 46(j) of the Restatement (Second) of Torts, which states that:

"The term 'emotional distress' passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." *See* 289 S.E.2d at 704 n. 20.

18. *W.Va.Code,* § 33–11–6 authorizes the commissioner to impose the following sanctions:

"(a) Require the payment to the State of West Virginia a penalty in a sum not exceeding $1,000 for each and every act or violation, but not to exceed an aggregate penalty of $10,000, unless the person knew or reasonably should have known he was in violation of this article, in which case the penalty shall be not more than $5,000 for each and every act or violation, but not to exceed an aggregate penalty of $50,000 in any six-month period.

(b) Revoke or suspend the license of such person if he knew or reasonably should have known that he was in violation of this article."

Court finds the Supreme Court of West Virginia's pronouncement in *Jenkins* to authorize the recovery of punitive damages in this action.

VII. *The Defendant's Conduct Need Not Constitute A "General Business Practice" To Be Actionable Under W.Va. Code, § 33–11–4(3) or (5)*

Erie contends that any recovery under *W.Va.Code,* § 33–11–4(3) or (5) must be predicated upon proof that the Defendant violated those subsections "with such frequency as to indicate a general business practice." Erie argues that the Plaintiff proved only a single violation of the Act and that a single violation cannot satisfy the requirement that the Defendant's conduct constitute a "general business practice."

Erie's argument stems from that portion of the *Jenkins* opinion wherein the court indicated that "it does seem clear that more than a single violation of *W.Va.Code,* § 33–11–4(9), must be shown in order to meet the statutory requirement of an indication of 'a general business practice' . . . ." 280 S.E.2d at 259. The fallacy of Erie's argument is demonstrated by the above reproduced quotation itself. The court in *Jenkins* was discussing the "general business practice" requirement *which is found only in subsection 4(9)*—the subsections involved here, 4(3) and 4(5), contain no such requirement. There is no indication whatsoever in either the Act or the *Jenkins* opinion that the general business practice requirement is applicable to any section of the Act other than the one in which the legislature found fit to include it. The Court, then, was correct in refusing to give Erie's proffered instruction which would have imported that requirement into subsections 4(3) and (5).

VIII. *The Act Was Not Applied Retroactively*

Erie's final argument is that, because a cause of action was not created under the Unfair Trade Practices Act until the West Virginia Supreme Court's decision in *Jenkins* in 1981, by allowing the Plaintiff to recover under that Act based upon Erie's conduct in 1979 amounts to giving full retroactive application to a new cause of action.

This argument requires only a cursory discussion. While the Court recognizes the caution which should be exercised before a novel cause of action is given full retroactive effect, *Bradley v. Appalachian Power Co.,* 256 S.E.2d 879 (W.Va.1978), the chronology of this case obviates the need to even consider whether the cause of action relied upon here should be given retroactive effect. The cause of action upon which Plaintiff recovered was *created* in 1974, the effective date of the Unfair Trade Practices Act, although it was not judicially *recognized* until the *Jenkins* decision in 1981. The cause of action existed, and Erie had notice of the conduct prohibited by the Act, as of the effective date of the statute, which predated Erie's wrongful conduct by five years. Therefore, the present case presents no issue of retroactivity.

IX. *Conclusion*

For the foregoing reasons, the Court does hereby rule as follows:

1. Erie's motion for a judgment notwithstanding the verdict is denied;

2. Erie's motion for a new trial is denied; and

3. Erie's motion for a remittitur is denied.